2023 IL App (2d) 220119-U
No. 2-22-0119
Order filed April 24, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-1916 |
| JACOB HEADTKE, | ) ) | Honorable David Paul Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Jorgensen and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not abuse its discretion in admitting other-crimes evidence of defendant's sexual conduct against two young boys, and the evidence was sufficient to convict defendant of aggravated criminal sexual assault. In addition, the State's error at closing argument was not plain error. Therefore, we affirm.

¶ 2   Defendant, Jacob Headtke, appeals his conviction following a jury trial of aggravated criminal sexual abuse of R.K., a minor. He raises three issues on appeal: (1) whether the State failed to prove his guilt beyond a reasonable doubt after he raised an affirmative defense of involuntary intoxication, (2) whether the trial court erred in admitting other-crimes evidence, and (3) whether the State made improper remarks in its closing argument. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      At the outset, we briefly comment on defendant's brief. Defendant's statement of facts is often argumentative and does not provide all the facts necessary for an understanding of the case and his arguments on appeal, such as by failing to recount the relevant portions of the State's closing arguments. Defendant is admonished to comply with Illinois Supreme Court Rule 341(h)(6) (eff. Oct 1, 2020) in future appeals.

¶ 5      On January 11, 2017, defendant was indicted on four counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2014)). Count one charged that defendant, who was 17 years of age or older, knowingly committed an act of sexual conduct sometime between October 1, 2015, and June 1, 2016, with R.K., who was under the age of 13 at the time of the act, for the purpose of the sexual gratification of the victim or the accused. Counts two through four charged defendant with aggravated criminal sexual abuse against a separate minor victim, J.K.

¶ 6      On September 30, 2019, defendant moved to sever the counts of his indictment. The trial court granted the motion, severing count one from counts two through four, and this appeal involves only defendant's trial on count one.

¶ 7                                  A. Pre-Trial Motions

¶ 8                      1. Section 115-10 Motion to Introduce Hearsay Statements

¶ 9      On April 27, 2017, the State filed notice of its intent to introduce hearsay statements of R.K. and J.K. pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2016)). The State intended to introduce statements made by R.K. to his grandmother, Michelle Taylor, around April and May 2016; to his mother, Lenni K., in May 2016; and video-recorded statements to Investigator Tim Bosshart at the Kane County Child Advocacy Center (CAC) on September 16, 2016. As to J.K., the State sought to introduce his October 2016

statements to his mother, Karla K., and his statements to investigators at the Kane County CAC on October 13, 2016.

¶ 10    At a hearing on the section 115-10 motion, the trial court stated it had considered the circumstances, time, and content of the statements to determine their reliability. It ruled that the State would be able to introduce some of the hearsay statements referenced in its section 115-10 filing. Specifically, the trial court would permit the State to introduce all statements except R.K.'s statements in the middle of the night to Lenni, R.K.'s statements to Bosshart at the CAC, and J.K.'s statements to Karla about defendant touching his private parts.

¶ 11    The State moved to reconsider the trial court's ruling on R.K.'s recorded statements to Bosshart at the CAC, and the trial court granted the State's motion to reconsider on May 24, 2019, permitting the statements if presented in proper form. After reviewing the recording, the trial court found that the statements complied with the requirements of section 115-10, and the State would be permitted to introduce the redacted statements.

¶ 12          2. Section 115-7.3 Motion to Introduce Other-Crimes Evidence

¶ 13    The State filed a motion *in limine* on November 27, 2019, seeking to introduce other-crimes evidence at trial pursuant to section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2018)). The State sought to introduce evidence at R.K.'s trial involving three victims: R.K., J.K., and A.D. With respect to R.K., the State sought to introduce evidence of an incident where R.K. and defendant were on a bed and defendant pulled his erect penis out through his underwear and scooted toward R.K.

¶ 14    With respect to J.K., the State sought to introduce evidence of multiple incidents where defendant touched J.K. The State alleged that J.K. would testify that defendant touched J.K. by putting his hands inside J.K.'s clothes and touching his penis while sleeping over at J.K.'s house

in January or February 2016. Further, defendant's statements to Bosshart at his CAC interview revealed three instances of touching: the aforementioned touching of J.K. in January or February 2016 at a sleepover, touching J.K.'s penis over his clothes while playing in J.K.'s room, and touching J.K.'s penis over his underwear while watching television at J.K.'s house.

¶ 15    Last, as to A.D., the State intended to offer evidence that defendant admitted to touching A.D., who was six or seven years old at the time, at the home of the parents of one of defendant's friends. Defendant's statements included putting his hand down A.D.'s pants and touching his penis directly, as well as making A.D. touch defendant's penis.

¶ 16    The State argued that all bad acts were proximate to the charged offenses, with the acts against R.K. occurring between October 2015 and June 2016, the acts against J.K. occurring between June 2015 and October 2016, and the acts against A.D. occurring within a few years prior to defendant's interview on November 4, 2016. The State continued that all conduct was similar in that all incidents involved defendant touching the penis of a boy under 12 years old. As to the similarity between R.K. and J.K., the State argued that both involved defendant developing a relationship with the boy and befriending the victim's family through his employment.

¶ 17    The State argued that the other-crimes evidence was important in R.K.'s trial because defendant did not admit or deny abusing R.K. but instead implied that any touching would have resulted from his unconscious actions while he was asleep. The State asserted that the other-crimes evidence was appropriate for multiple purposes: to show defendant's propensity to commit sexual abuse, as well as to show his knowledge, intent, and absence of mistake.

¶ 18    Following a hearing on the motion, the trial court granted the State's section 115-7.3 motion. It stated that it had "actually given this quite a bit of thought and read the cases and the statute and all the appropriate information and considered the arguments of counsel." It believed

that the statute allowed this type of evidence provided that the probative value outweighed the prejudicial effect and certain other factors were met, and the statute was satisfied in this case. The trial court then stated, "This really, to me, is part of the same continuing course of conduct, if true as alleged."

¶ 19                                      B. Trial Testimony

¶ 20    R.K. testified as follows. He was born on June 19, 2004, and he was 16 years old at the time of trial. He was entering his senior year of high school in the coming school year. His mother was Lenni K., and he had an older brother who was then 32 years old.

¶ 21    While R.K. was in sixth grade, he was living with his mother at a house in Carpentersville, and his grandmother, Michelle Taylor, lived nearby; his brother had moved out by the time he was in sixth grade. In the summer before R.K. entered sixth grade, he attended a sports camp in Carpentersville. Defendant was one of the counselors at the camp, and R.K. had a lot of interaction with defendant at the camp. Defendant also worked at an elementary school with R.K.'s grandmother. R.K. would sometimes visit his grandmother at the school's afterschool program, and he would see defendant there.

¶ 22    Defendant babysat R.K. when he was in the sixth grade, which would have been in 2015. That year, in the week before Halloween, R.K.'s mother took a trip, and defendant watched him while she was away. Sometime after Halloween, when defendant was still in sixth grade, defendant came to live with R.K. and his mother at their home. Defendant stayed in R.K.'s brother's old bedroom, which was on the second floor of the home.

¶ 23    Initially, defendant's stay at their home was going well. Defendant would drive R.K. to school and get him food. R.K.'s relationship with defendant shortly after he moved in was "[g]reat," and he "was like a big brother" to him. This did not last. Defendant was physically

affectionate with R.K., desiring hugs and goodnight kisses, which made R.K. uncomfortable because defendant was not family: "It was weird to me at the time." During the course of defendant's stay at R.K.'s home, defendant's physical touching escalated, with R.K. recalling several incidents that went beyond unwanted hugs and kisses.

¶ 24    The first incident occurred in the evening in his brother's old room. His mother was not home. R.K. was sitting on the bed watching television. Defendant was lying near him on the bed, and R.K. "thought [defendant] was asleep." R.K. assumed defendant was sleeping because his eyes were closed. Defendant was wearing a T-shirt and shorts. At some point, defendant reached over and touched R.K.'s penis over his clothes, and R.K. described the touch as a grab. R.K. quickly removed defendant's hand, and defendant placed his hand back on R.K.'s penis. R.K. again removed his hand, but he did not say anything to defendant at the time. Defendant then grabbed his penis for a third time over his clothing, and R.K. again removed his hand. This back-and-forth continued several times; R.K did not know exactly how many times it happened. R.K. eventually left the bed and locked himself in his mother's room. He did not see defendant again that evening.

¶ 25    A second incident occurred at a later date while defendant was living with R.K. Like the first incident, it occurred in the evening when R.K.'s mother was not home. R.K. was sitting on the bed in his brother's old room and watching television, and defendant was lying on the bed with a blanket over him. While R.K. was watching television, defendant shed the blanket, and R.K. observed that he was wearing boxers and a tank top. Defendant ruffled with his boxers, pulled his penis out, turned towards R.K., and "started scooching toward [him]." Defendant's penis was erect. When defendant scooted toward him, R.K. "got up immediately" and went to his mother's room and locked the door. He did not see defendant again that evening.

¶ 26    A third incident occurred after the first incident and "most likely" after the second, although R.K. was not certain about the timeline of events. Like the first two incidents, the third incident occurred in the evening in his brother's old room while his mother was not home. R.K. and defendant were both lying on the bed. R.K. was wearing a T-shirt and shorts, and he was "most likely awake," although he "was fading in and out." He thought defendant was asleep at the time. While R.K. had his eyes closed, he felt defendant's hand reach inside his clothes and grab his penis; his hand touched his penis directly. R.K. took defendant's hand out and acted like nothing had happened. Defendant put his hand back under R.K.'s clothes and grabbed his penis again. R.K. removed his hand, and this pattern of defendant grabbing his penis and R.K. removing his hand continued several times. R.K. eventually got up, went to his mother's room, and locked the door. He did not see defendant again that evening.

¶ 27    After these events, R.K.'s relationship with defendant changed. R.K. "despised him," and he did not want to be alone with defendant. If his mother would leave the home, he would go with her. R.K. did not immediately tell anyone about what happened with defendant. He explained that his mother was struggling with "money issues" and that the extra income from defendant staying with them was nice, and he "was scared that if [he] said anything, [they would] be out on the streets."

¶ 28    R.K. eventually told his mother about defendant. He was still in the sixth grade, but he did not remember what month it was. He remembered that he was in the car with his mother while they were parked in the garage. He also told his grandmother about defendant after he told his mother. Sometime after he told them, his mother and grandmother took him to talk with the authorities.

¶ 29    On cross-examination, R.K. answered that he remembered speaking with Bosshart. He knew that his interview with Bosshart was recorded, and he had seen the video of their interview. Defense counsel asked R.K. about a separate, fourth incident, which occurred on the sixth day that defendant was babysitting him in October 2015, which was before defendant was living at R.K.'s house. Defense counsel asked if R.K. told Bosshart about defendant putting his hand over R.K.'s crotch, and R.K. answered yes, that he told Bosshart that defendant performed that action multiple times in one night.

¶ 30    Defense counsel also asked R.K. about the three incidents he testified to in his direct examination. He asked whether R.K. went to his mother's room and locked the door during the times that defendant was living at his house and if he told Bosshart that he had also done that while defendant was babysitting him. R.K. answered that he had locked himself in his mother's room while defendant was babysitting, and he confirmed that he had done so because defendant had touched him while babysitting him. The incident of defendant's touching while babysitting was separate from the three incidents R.K. had described in his direct testimony. R.K. agreed with defense counsel that he had not told Bosshart at his interview about the third incident, where defendant had touched him directly on his penis.

¶ 31    Michelle Taylor testified as follows. She was R.K.'s grandmother and Lenni's mother. She had been introduced to defendant "very nonchalantly" years ago through defendant's sister before working with him at Eastview school in Algonquin, where they were both assistants at the after-school program. She was also aware that defendant, during the same time period, worked for the park district in its summer programs.

¶ 32    At some point, Michelle discussed with Lenni the possibility of defendant renting a room from Lenni. Michelle knew that defendant was looking for a place to live and that Lenni had "fallen

upon some hard times." At the time, Michelle was a "good friend" of defendant, and she thought defendant renting a room at Lenni's house would be a "win-win situation for both sides." Defendant had met Lenni and R.K. before, and he and R.K. were friendly.

¶ 33    Defendant ended up living at Lenni's home for several months. At first, defendant's stay was going well: "things were good" and "everybody was copacetic." R.K. seemed to look up to defendant like a big brother. However, Lenni later raised concerns with her about defendant's stay, which led Michelle to be concerned for R.K. Michelle had a conversation with R.K. in the living room of her home. Only she and R.K. were present, and R.K. did not tell her anything immediately. She told R.K. that she had heard from his mother that there may have been a problem or issue going on at home. She reminded him how much she loved him and that she would always be there for him. She then asked him if anything was happening with defendant. R.K. was "fairly emotional"; she could tell he was "pretty choked up," and he was hesitant and nervous. R.K. told her something was going on that he was "very uncomfortable with," with defendant being "touchy, touchy, hands on." He did not immediately say what he meant by "touchy, touchy."

¶ 34    R.K. eventually told her about several incidents where defendant would take either his or R.K.'s hands and move them into either his or R.K.'s "private" area, which she interpreted to mean his crotch. R.K. had described one specific instance to her, in which R.K. was getting ready for school and crossed in front of defendant's bedroom. Defendant was lying on the bed and had pulled his private parts out of his pants. R.K. told her he was scared and did not want to be in the car with defendant, who had to drive him to school. Michelle made a police report about defendant on May 6, 2016.

¶ 35    Lenni K. testified as follows. She knew defendant through Michelle, and R.K. attended a sports camp in the summer of 2015 where defendant was the director. At that time, R.K. was 11

years old and was about to enter sixth grade. In October of 2015, Lenni took a trip of about one week, returning on Halloween, and defendant watched R.K. while she was gone. Shortly after Halloween, defendant came to live at her house, and he lived at her home from around October 2015 through April 2016. Lenni had been struggling with childcare and transportation after a change in her employment, and defendant had been living with family that was relocating to Tennessee, and he did not want to move with them. Therefore, Lenni thought that defendant staying with her and R.K. would be mutually beneficial, as he would pay rent and help out with transportation and childcare. Prior to defendant living with them, Lenni described R.K. and defendant as having a "nice relationship," and R.K. "adored" defendant.

¶ 36    Lenni's house had three bedrooms, and defendant had his own room, which was her elder son's old room. In addition to paying rent, defendant drove R.K. to and from school, and he provided childcare before and after school. Initially, defendant's stay was "wonderful." But, after several months, she noticed a change in R.K.'s behavior. She noticed he did not want to hug defendant like before, and he would "stiffen up and pull away and back up." She also noticed that R.K. began sitting in the back of the car instead of the front when defendant would drive him to school. R.K. asked her if defendant could not take him to school anymore; he did not want to be in defendant's car or to go places with defendant anymore, and "[t]hat was a big change."

¶ 37    Based on these changes, Lenni became concerned. She expressed her concerns to Michelle, and she tried to talk to R.K. They had multiple conversations, and she mentioned the changes she observed in R.K. around defendant. At first, R.K. did not tell her much; he "tried to play it off like everything was okay and he was fine." But, after talking to him several times, R.K. told her about what was happening. At their last conversation, which was between just her and R.K., he "burst

into uncontrollable tears," and then he told her about several incidents where defendant had made sexual gestures or advances toward him and touched him inappropriately.

¶ 38    As to the specific incidents that R.K. told her about, Lenni began by explaining that defendant had a video game setup in his room, and he and R.K. would play video games a lot. One incident that R.K. told her about occurred when they were playing video games. When it was R.K.'s turn to play the video game, he felt defendant's hand on his penis over his clothes. When he looked at defendant, he saw that defendant's eyes were closed, and he initially thought defendant was sleeping. When they had first begun playing, defendant had been awake. After he removed defendant's hand, defendant placed it back on his penis, and this happened several times. R.K. eventually ran out of the room. He told Lenni that he did not think defendant had actually been sleeping, because he had kept putting his hand on him over and over.

¶ 39    Another incident occurred when they were playing video games in defendant's room. R.K. was playing video games when he felt something against his back. When he felt it again, he turned and saw that defendant had an erection sticking out of the hole in his underwear, and his eyes were closed. R.K. said he got scared and ran out of the room.

¶ 40    Shortly after R.K. told her about defendant's behavior, Michelle filed a police report, and Lenni told defendant that she needed to a have a conversation with him. They never had a conversation because after she told defendant that she wanted to talk, he started staying at his mother's house and not coming to Lenni's house in the evenings, and this continued for several evenings. He then notified her that he would be moving out, and he never stayed at her house again.

¶ 41    After Lenni's testimony concluded, the State began calling witnesses to produce other-crimes evidence against a separate victim. J.K., who was born in January 2007 and was 14 years

old at the time of trial, testified as follows. His mother was Karla K., and he had a younger sister named Tanna. When he was younger, J.K. attended summer sports camps, and defendant was one of his camp counselors. Defendant became a family friend, and he helped his mother out. He and defendant would watch baseball games and play football.

¶ 42   Defendant stayed overnight at J.K.'s house once when J.K. was seven or eight years old. Defendant had two young children with him when he stayed over, but J.K. could not recall their names. One of the children was only around two years old. Defendant, the two other children, and J.K. all slept in J.K.'s room. Defendant slept on J.K.'s bed, and J.K. and the two younger children were on an air mattress.

¶ 43   After J.K. fell asleep on the air mattress, defendant woke him by calling his name. J.K. did not respond immediately. Defendant called out to him to come to the bed, and J.K. eventually did so. When J.K. was lying in the bed, defendant put his hand in J.K.'s pants and tried to grab his penis; he was "tingling" a part of his body next to the penis, but J.K. did not know what it was called. J.K. got out of bed and told defendant he had to go to the bathroom. He went to the bathroom and then went to tell his mother in her room. He told his mother and then went back to sleep.

¶ 44   J.K. did not remember whether defendant came over to his home after a football game. He also did not remember if defendant had touched him in or around the penis on another occasion.

¶ 45   Karla K. was J.K.'s mother, and she testified as follows. Karla knew defendant through a sports camp that her children attended. She would speak to him when picking up or dropping off her kids.

¶ 46   She and defendant developed a friendship after Karla had a hospital stay in June 2015. When she was released from the hospital, she was in a wheelchair and was unable to fully care for her children. Defendant offered to help with whatever she needed, and she accepted his offer.

Starting around September 2015, defendant would come over to her house and hang out with her kids. Defendant became a family friend, and she trusted him. Their friendship ended as a result of Karla filing a police report against him in October 2016. The report was based on what her son, J.K., had told her.[1]

¶ 47  Defendant came over to Karla's house sometime around January or February 2016. Defendant came over with two young boys: one boy was six or seven years old, and the other was only one or two years old. At the time, J.K. was around eight or nine years old. Defendant helped put together a Christmas gift that her son had received, and he asked to stay overnight, which Karla said was fine. Defendant and the boys stayed together in one room. Defendant was on J.K.'s bed, and the children were on an air mattress. She did not recall whether J.K. ever came to her room in the middle of the night.

¶ 48  Karla testified to another time that defendant came to her house. Around August or September 2016, she had been at a football game with defendant and her children. After the game, defendant, Karla, her daughter, and J.K. went back to Karla's home. They spent time together in the family room and watched television, and Karla fell asleep. About a month after this day, she made a police report regarding defendant.

¶ 49  The State's final witness was Tim Bosshart, an investigator with the Kane County CAC, who testified as follows. At the time of trial, he had been at the CAC for 5 years, and before that he had been a police officer in Carpentersville for 30 years. On or around August 31, 2016, he was assigned to a CAC investigation of defendant and R.K. that had begun in May 2016.

---

[1]Pursuant to the trial court's ruling on the State's section 115-10 motion, the State could not introduce J.K.'s hearsay statements to Karla about defendant touching his private parts.

¶ 50    Bosshart interviewed R.K. at the CAC, and the interview was video recorded. Bosshart reviewed the video recording, which was introduced as People's Exhibit 1, and he found it to be an accurate representation of his interview with R.K. The recording was admitted over defendant's objection based on the pre-trial motions, and a transcript of the interview was also allowed as an aid to the jury.

¶ 51    Only Bosshart and R.K. were present in the interview room, and Department of Children and Family Services (DCFS) Investigator Alicia Kinas observed the interview from a remote location. R.K. was 12 years old at the time of the interview, and he was "very emotional. He cried through quite a bit" of the interview.

¶ 52    Bosshart received another CAC referral involving defendant and J.K. He interviewed J.K. on October 13, 2016. After the interview, Carpentersville police officers located defendant and escorted him to the CAC, where Bosshart interviewed him on November 4, 2016.

¶ 53    Bosshart testified that defendant was read his *Miranda* rights, was not handcuffed, and was told he was free to leave. Bosshart asked defendant if he had had any sexual contact with R.K. Initially, defendant said no. He said that, on a few occasions, R.K. had climbed into bed with him. Bosshart explained that R.K. had said that some things had happened, and he asked defendant if R.K. would lie about that. Defendant answered no, he did not think R.K. would lie about something serious, and defendant continued that he did not remember anything happening and that he had been taking Ambien. Defendant said that he was not denying that something had happened.

¶ 54    Bosshart then asked defendant about J.K. Defendant confirmed that he had slept over at J.K.'s house, and he had brought the two children of a woman he was dating. Bosshart asked if he had taken any Ambien that night, and defendant said no. Initially, defendant denied that anything

- 14 -

inappropriate happened. Bosshart explained the importance of being honest, and defendant asked for a break so he could think about his responses.

¶ 55    Following about a 15-minute break, the interview resumed, and defendant stated that he wanted to tell the truth. With respect to R.K., Bosshart related that defendant said he did not remember what happened, "but that [R.K.] was probably correct."

¶ 56    As to J.K., he described three incidents that occurred. The first was in J.K.'s bedroom where they were playing with a little basketball hoop, and he grabbed J.K.'s genitals over his clothing. He said he did it on purpose but made it look like an accident.

¶ 57    The second incident with J.K. occurred in J.K.'s living room. Karla had fallen asleep on the couch while they were watching television. J.K. had just showered and was wearing underwear, and defendant said he touched J.K. on his penis over his underwear.

¶ 58    The third incident with J.K. occurred at the sleepover at J.K.'s house with the two other boys. The boys were sleeping on an air mattress, and defendant called for J.K. to come to the bed with him. When J.K. came to the bed, defendant reached into his underwear and touched his penis.

¶ 59    Bosshart asked defendant why he had done this to J.K. Defendant "advised that he realized he had a problem with kids." He did not know why he had touched J.K., but he was nervous when doing it and got an adrenaline rush when he did.

¶ 60    Bosshart asked him if he had ever touched other kids aside from R.K. and J.K. Defendant named another boy, A.D., who he said he molested 10 to 20 times. Defendant would fondle A.D.'s penis over and under his clothing, and he would have A.D. "masturbate him on different occasions." Defendant said that he believed that A.D. was eight years old at the time.

¶ 61    Defendant said he knew his actions were wrong, and he agreed that he had a problem with touching children inappropriately. He said he wanted to talk to a psychiatrist about it. Defendant

answered that, after touching children inappropriately, he would sometimes go into the bathroom or another room and masturbate, but he denied ever masturbating in front of children.

¶ 62    At this point in the interview, Bosshart asked defendant to give a recorded statement, and he agreed to do so. An audio recording of their interview was admitted into evidence along with a transcript of the recording as an aid to the jury. In the recording, defendant confirmed that he did not remember anything inappropriate happening with R.K. He did not think R.K. would have lied about what happened. Defendant then described the three incidents with J.K. In addition, he described a separate event involving J.K. and a separate boy, R.W. Defendant thought they were going to have a sleepover that did not happen, and he was driving the boys home. He remembered unintentionally grabbing R.W. while still in the car, and J.K. saw him touch R.W.'s penis over his clothing. Defendant claimed this incident was different than the incidents with J.K. because the touching was not intentional.

¶ 63    Last, in the recording, defendant spoke about the events involving A.D., stating that A.D. was six or seven years old at the time he was with him, and defendant believed that A.D. had just turned eight years old at the time of the interview. Defendant was with A.D. "possibly" 10 to 20 times. He would put his hand down A.D.'s pants and fondle him, and he made A.D. do the same to him, but "no one ejaculated." Defendant got an erection from these activities. The touching occurred at a friend's parent's home. In admitting that he had a problem with touching kids, defendant thought that he had had the problem since getting out of the Marines in 2012.

¶ 64    The State rested, and the trial court denied defendant's motion for a directed verdict.

¶ 65    Defendant testified as follows. He served in the military with the Marines from 2008 to 2012, performing a tour of duty in Afghanistan in 2010 before being honorably discharged. After

returning to civilian life, he was diagnosed with anxiety, depression, and post-traumatic stress disorder stemming from his military service.

¶ 66    Around March 2015, he was prescribed a 10-milligram dose of zolpidem, known by its brand name Ambien, to help him sleep. He received that prescription through the Veteran's Administration, and he later received a second prescription under separate insurance coverage. He did not need to take the prescription every night; he took it only when he needed it to sleep. When he took the drug, he took the full prescribed dose, and he never took it during the day. Defendant testified that he was using Ambien around October and November 2015. He believed that he was using Ambien in the fall of 2015 more than he had used it previously because moving in with Lenni and R.K. increased his anxiety. He could not say which specific days he took Ambien and which he did not.

¶ 67    On cross-examination, defendant confirmed that his first prescription was for 30 doses of Ambien, and he took some of those doses in March 2015. He never reported any side effects of Ambien to a doctor. He believed that he did not obtain his second prescription of Ambien until 2016, more than a year after his first prescription. He testified that he took Ambien "[m]aybe once or twice" during the week he babysat R.K. in October 2015. When he lived with Lenni and R.K., he took "[m]aybe about six" doses.

¶ 68    Michael Stefanik was an assistant professor of psychology and neuroscience at North Central College, and the trial court accepted Stefanik as an expert in the fields of pharmacology and neurobiology. He testified as follows. Zolpidem was part of the category of sedative-hypnotics, which broadly had the intended effect of sedation to help alleviate anxiety. Zolpidem was more biased toward "the hypnotic form," which meant it induced sleep. Serious side effects included getting out of bed while not fully awake and performing an activity that the person did

not know they were doing. These activities included sleepwalking, sleep-driving, sleep-eating, and sleep-sex. Individuals would appear conscious to others while performing sleep-activities, but they would not remember having performed these sleep-activities.

¶ 69    When Ambien was released onto the market, the standard dosage was 10 milligrams, but the United States Food and Drug Administration (FDA) adjusted the standard dosage in 2003 to 5 milligrams for females and 10 milligrams for males but with a preference for the lower dose. The change in recommended dosing was the result of complaints and further studies into the side effects of zolpidem.

¶ 70    On cross-examination, Stefanik answered that he did not know defendant and was not provided any information about his prescription for Ambien or his usage of Ambien. He had not been provided with any police reports about the facts of this case. He agreed that not all side effects of Ambien were extreme, with the most common ones being nausea and dizziness. Studies showed that the complex behaviors resulting from taking zolpidem, including sleep-driving and sleep-sex, occurred in only 1 to 5% of individuals. The studies did not distinguish among the type of complex activity a person performed but instead gave a lump percentage of people experiencing that general side effect. Sleep-driving was the most commonly reported complex activity. The definition of "sleep-sex" was highly variable, including even those who reported being the victim of a sexual assault while they were on Ambien.

¶ 71    Stefanik confirmed that the studies he relied on were "[b]y and large" not laboratory studies. People in the studies reported whether they were experiencing side effects of Ambien, and he agreed it would be "relatively difficult" to study in a laboratory setting. He explained that the FDA would consider multiple studies, "somewhere in the neighborhood of 50 or 60" studies, to assess whether there was a problem.

¶ 72                              C. Closing Argument

¶ 73    The State began its closing argument by reminding the jury that defendant admitted to Bosshart that he had a problem with touching kids:

> "His words. I have a problem touching kids. That man, the defendant, \*\*\*, he's what we call a wolf in sheep's clothing.

> What he likes to do is befriend single mothers with young boys, young children. What he likes to do is work his way into their lives. What he likes to do is pretend to be the good guy, the babysitter, the one who can help, the hero of the story.

> But, \*\*\*, what you know is that he really is a child molester. \*\*\* You know he works his way into Lenni's life, [R.K.'s] life. \*\*\* Got so much trust in that family \*\*\* that he was allowed to watch [R.K.] by himself overnight for a week at a time.

> But what you know is that during those times his sheep clothes came off. He turned into a wolf. And he did things to [R.K.] that should never be done to a child."

¶ 74    The State proceeded to discuss the jury instructions that it expected the trial court would read them, beginning with the propositions it had to prove for aggravated criminal sexual abuse, which included R.K.'s age and that defendant committed an act of sexual conduct. The State then stated the instruction on involuntary intoxication as follows: "A person who is in a drug [*sic*] condition which has been involuntarily produced is not criminally responsible for his conduct if the condition deprives him of substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

¶ 75    The State asked, "What's this about?" and then reminded the jury about the testimony they heard about Ambien, such as side effects like sleep-sex, and explained as follows:

"That's what this fourth proposition goes towards. That when the defendant committed that act of sexual conduct with [R.K.] that he had the substantial capacity to appreciate the criminality of his conduct and conform his conduct to the requirements of law.

The first thing I want to point out to you about that drug instruction, it talks about a person who has been involuntarily or that the condition has been involuntarily produced. Well, members of the jury, nobody forced [defendant] to take Ambien. No one opened his mouth, put it down there and made him take it. He took it full well knowing how it affected him. He told you he had been taking it since March of 2015. Nobody forced him. It wasn't involuntary."

The State continued that even if the jury found defendant's taking of Ambien was involuntary, defendant could not say if or when he was taking Ambien.

¶ 76    The State then referenced Stefanik's testimony that a normal person observing another suffering the complex effects of Ambien, such as sleep driving, would think that person was awake and that their eyes would be open. But, the State argued, R.K. thought defendant was asleep, and his eyes were closed.

¶ 77    The State then argued that Stefanik had testified that the complex side effects of Ambien were often self-reported, which the State said, "makes some sense, I guess." The State told the jury to ask themselves if a person reporting side effects of Ambien when accused of sexual misconduct was really under the effects of Ambien or was using Ambien as an excuse as an attempt to avoid a crime. The State elaborated:

"There is no laboratory study to show that happens. That's people's reports. That's what defendant is trying to do. Don't let him trick you. It's an excuse. It's nothing else.

Sure, it's in the FDA warnings because when people report it happening, it's better safe than sorry, I guess, to include it but that doesn't mean you have to believe it actually occurs."

¶ 78    Defense counsel made no objection to the State's closing.

¶ 79    In defendant's closing argument, defense counsel responded to the State, arguing that if the jury found that defendant was involuntarily under the influence of Ambien at the time of the alleged offense, they should find him not guilty. Counsel continued:

"Let's talk about involuntary for a moment. The State talked about he wasn't forced, it wasn't rammed own his throat. Well, that's not the only situation. These side effects that Dr. Stefanik talked to you about are hard to gauge even for the professionals. The percentages may be low within the population[,] but you don't know when or how it may affect a certain individual.

***

Does an individual read every time they get a prescription from the FDA medication guide? No."

¶ 80    Defense counsel reminded the jury that Stefanik testified that complex behavior as a side effect of Ambien would not be conscious behavior, and the person could appear to be awake. Counsel argued that if defendant was in a "hypnotic state based on the medication," he did not perform conscious actions against R.K., even if the touching occurred.

¶ 81    In rebuttal, the State argued that defendant did not deny that the touching occurred but instead simply claimed he was on Ambien. It argued that he was faking being asleep, and that he "was being the sheep, the good guy."

¶ 82                                    D. Jury Instructions

¶ 83    As Defense Instruction No. 1, defense counsel offered Illinois Pattern Jury Instructions, Criminal, No. 24-25.03 (hereinafter IPI Criminal No. 24-25.03), and the trial court gave the instruction to the jury. The instruction read: "A person who is in a drugged condition which has been involuntarily produced is not criminally responsible for his conduct if the condition deprives him of substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

¶ 84    The trial court also read to the jury that, to sustain the charge of aggravated criminal sexual abuse, the State had to prove four propositions: (1) that defendant knowingly committed an act of sexual conduct with R.K.; that at the time of the offense, (2) defendant was 17 years of age or older and (3) R.K. was under 13 years of age; and (4) defendant had substantial capacity at the time of the offense to appreciate the criminality of his conduct and conform his conduct to the requirements of the law. The fourth proposition was given pursuant to IPI Criminal No. 24-25.03A, which provided that the proposition be added to the issues instruction for the offense charged when IPI Criminal No. 24-25.03 is given.

¶ 85                         E. Jury Verdict and Sentence

¶ 86    On June 23, 2021, the jury found defendant guilty of count one for aggravated criminal sexual abuse. After defendant's guilty verdict, he pled guilty to an amended count two for the charge of attempted aggravated criminal sexual abuse of J.K., and the State dropped counts three and four of the severed complaint.

¶ 87    On March 31, 2022, defendant was sentenced to five years' imprisonment on count one and a concurrent term of three years' imprisonment on count two. This timely appeal followed.

¶ 88                         II. ANALYSIS

¶ 89                         A. Other-Crimes Evidence

¶ 90    Because the admission of other-crimes evidence impacts whether the State proved defendant's guilt beyond a reasonable doubt, we first address defendant's argument that the trial court erred in admitting other-crimes evidence. Defendant argues that the trial court erred in admitting between 15 and 25 instances of other-crimes evidence pursuant to section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2018)) because the evidence lacked sufficient factual similarity and was overly prejudicial. Defendant takes exception to the fact that most of the other-crimes evidence admitted at trial was not supported by victim testimony but instead was based on defendant's statements to the police.

¶ 91    Turning specifically to the other-crimes evidence involving A.D., defendant argues that there was insufficient factual similarity between the charged conduct and other-crimes because the trial court had no basis to assess the proximity of the acts against A.D. to those against R.K. He argues that the trial court also failed to analyze separately the 10 to 20 acts involving A.D., and, in fact, had no way to assess those acts' similarity to the acts against R.K. He continues that the "only similarities between the acts that the State presented are that R.K. and A.D. were both minors and [defendant] is alleged to have touched their penises." Defendant stresses that the State failed to present an account of the acts beyond offering defendant's own statements. Further, he argues the instances were dissimilar in that defendant feigned sleep with R.K. but not with A.D., showing a "different approach and strategy" to touching the children, and that the allegations against R.K. took place in R.K.'s house whereas the acts with A.D. took place outside A.D.'s home.

¶ 92    Defendant argues similarly that the criminal acts involving J.K. and R.W. were factually dissimilar from the alleged acts with R.K., and he highlights that J.K. testified that two of the other-crimes acts did not occur.

¶ 93　Defendant additionally argues that the trial court abused its discretion by failing to provide a meaningful analysis of the propensity evidence by not engaging in separate analyses weighing the evidence's probative value against its prejudicial effect for each bad act. Defendant acknowledges that the failure to conduct a meaningful assessment is not dispositive but should be a factor favoring reversal. He also argues that the trial court applied the wrong standard to the evidence when it found that the incidents were part of a continuing course of conduct. Defendant concludes that the erroneous admission of other-crimes evidence was not harmless.

¶ 94　The term "other-crimes evidence" encompasses misconduct and criminal acts that occurred before or after the alleged charged conduct, including acts of misconduct for which the defendant was not charged or convicted. *People v. Sims*, 2019 IL App (3d) 170417, ¶ 28. In general, other-crimes evidence is not admissible to show a defendant's criminal propensity. *People v. Bochenek*, 2020 IL App (2d) 170545, ¶ 56. Other-crimes evidence may be admissible for other purposes, such as to show a defendant's motive, opportunity, intent, or absence of mistake. *Id.*; see also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011).

¶ 95　As an exception to the general rule, section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2018)) permits the admission of other-crimes evidence in certain cases to show a defendant's propensity to commit specified offenses. *People v. Boyd*, 366 Ill. App. 3d 84, 90 (2006). In enacting section 115-7.3, the legislature "intended to single out sex offenders *** in recognition of the propensity of sex offenders to repeat their crimes." *People v. Childress*, 338 Ill. App. 3d 540, 549 (2003).

¶ 96　The offenses to which section 115-7.3 applies include aggravated criminal sexual abuse. 725 ILCS 5/115-7.3(a)(1) (West 2018). When a defendant is accused of one of the listed offenses under section 115-7.3(a), evidence of the defendant's commission of another one of those listed

offenses is admissible for "any matter to which it is relevant." *Id.* § 115-7.3(b). "Any matter" specifically includes a defendant's propensity to commit the sex offenses delineated by the section. *People v. Donoho*, 204 Ill. 2d 159, 176 (2003).

¶ 97 Section 115-7.3 incorporates the general rules of evidence and expressly provides for the weighing of the evidence's probative value against its undue prejudice to the defendant. 725 ILCS 5/115-7.3(b), (c) (2016). In weighing the probative value of the evidence against its prejudicial effect, the statute provides that a court may consider the proximity in time to the charged offense, the degree of factual similarity to the predicate offense, or other relevant facts or circumstances. 725 ILCS 5/115-7.3(c) (West 2018). Other-crimes evidence must bear at least some threshold similarity to the charged offense, and as the factual similarities to the charged conduct increase, so too does the evidence's probative value. *Donoho*, 204 Ill. 2d at 184. Furthermore, our supreme court has urged trial judges to be cautious in the admission of other-crimes evidence for the purpose of showing propensity, advising them to engage in a "meaningful assessment of the probative value versus the prejudicial impact of the evidence." *Donoho*, 204 Ill. 2d at 186.

¶ 98 Whether to admit other-crimes evidence is a decision that rests in the sound discretion of the trial court. *Bochenek*, 2020 IL App (2d) 170545, ¶ 56. An abuse of discretion occurs where the trial court's evaluation is arbitrary, fanciful, or unreasonable. *Donoho*, 204 Ill. 2d at 182.

¶ 99 We hold that the trial court did not abuse its discretion in admitting evidence of other crimes against J.K. and A.D.[2] We first reject defendant's position that his statements to prosecutors required victim corroboration. His statements were certainly evidence of other bad acts, and

_____

[2]Defendant does not argue that the other-crimes evidence involving R.K., where defendant exposed his penis through his underwear and scooched toward R.K., was erroneously admitted.

defendant provides no support for his position that other-crimes evidence requires corroboration of the defendant's admissions. Section 115-7.3 permits "*evidence* of the defendant's commission of another offense" (emphasis added) (720 ILCS 115-7.3(b) (West 2018)) and defendant's statements were admissible evidence, as they were statements by a party-opponent (Ill. R. Evid. 801(d)(2) (eff. Oct. 15, 2015); see also *People v. Broches*, 2022 IL App (2d) 200001, ¶ 27).

¶ 100   Here, defendant was charged with aggravated criminal sexual abuse, and the acts against J.K. and A.D. were likewise evidence of aggravated criminal sexual abuse in that the boys were under 13 years old when defendant performed acts of sexual conduct by fondling their penises. See 720 ILCS 5/11-0.1 (West 2020) ("sexual conduct" includes any knowing touching or fondling by the accused of any part of the body of a child under 13 years of age). Thus, section 115-7.3 was applicable, as aggravated criminal sexual abuse is a named offense. 720 ILCS 5/115-7.3(a) (West 2018).

¶ 101   Next, the three incidents involving J.K. bore striking factual similarity to the incidents involving R.K. Defendant was both J.K.'s and R.K.'s camp counselor, he ingratiated himself with their families, he was invited to their homes, and he fondled their penises over and under their clothing while at their respective homes. The touching involving A.D. also bore sufficient factual similarity to the touching of R.K. Although the touching of A.D. did not occur at A.D.'s home and defendant also had A.D. touch him, A.D. was a young boy like R.K., and defendant admitted to fondling A.D.'s penis over and under his clothing on several occasions at another adult's home. In sum, defendant's acts against all three boys involved defendant fondling the penis of a boy between the ages of 6 and 11 years old at another's home.

¶ 102   The trial court reasonably determined that the probative value of these other bad acts was not outweighed by their prejudicial effects. Not only were defendant's other acts factually similar

to his acts against R.K., but they were also proximal in time. Defendant touched J.K. within the same general timeframe of 2015 to 2016, and he fondled A.D. sometime within two to three years of defendant's interview with Bosshart in November of 2016. Although this evidence was undoubtedly prejudicial to defendant (*People v. Lamonica*, 2021 IL App (2d) 200136, ¶ 51)), section 115-7.3 was designed to permit propensity evidence of sex crimes (*Childress*, 338 Ill. App. 3d at 549), and thus the danger of undue prejudice is less pronounced here (*People v. Walston*, 386 Ill. App. 3d 598, 620 (2008)).

¶ 103   Moreover, the probative value of the evidence was heightened here. Defendant put his state of mind at issue when he raised the affirmative defense of involuntary intoxication. The other-crimes evidence went directly toward countering defendant's argument that he was unaware of his actions or substantially incapable of appreciating the criminality of his conduct. In addition to showing defendant's propensity to commit aggravated criminal sexual abuse, the other-crimes evidence showed he had an intent to fondle R.K. and that the fondling was not the result of taking Ambien.

¶ 104   We further reject defendant's position that the trial court was required to separately analyze the 10 to 20 incidents against A.D. Defendant was simply describing the number of times he fondled A.D. in the same ways at the same house. Not only was there nothing more for the trial court to analyze but also a contrary ruling may encourage the introduction of multiplicitous and cumulative other-crimes evidence, which would be at odds with courts' warnings against putting on a trial within a trial. See *Boyd*, 266 Ill. App. 3d at 94.

¶ 105   Having determined that the trial court did not abuse its discretion in admitting the other-crimes evidence involving J.K. and A.D., we reject defendant's additional arguments that the trial court abused its discretion because it failed to conduct a meaningful assessment of the evidence or

applied the wrong standard. Defendant acknowledges that the meaningful assessment of propensity evidence encouraged by our supreme court in *Donoho* is not dispositive on its own. While we agree that the trial court was light on its on-record analysis—it stated in a conclusory fashion that it had given the section 115-7.3 motion "quite a bit of thought" and that the probative value outweighed the prejudicial effect—the statutory requirements were satisfied, including that the probative value of other-crimes evidence outweighed its prejudicial effect, which is our salient inquiry. See *People v. Groel*, 2012 IL App (3d) 090595, ¶¶ 42-44. Further, the trial court applied the appropriate standard in finding that the probative value outweighed the prejudicial effect. Its comment that these acts were part of the same continuing course of conduct did not negate or override its application of the appropriate balancing test and statutory requirements.

¶ 106 Last, we turn to the other-crimes evidence involving R.W. He was mentioned only in the recording of defendant's interview with Bosshart, where defendant admitted to Bosshart that, while driving J.K. and R.W. home, he unintentionally touched R.W.'s penis over his clothing. Although it does not appear that defense counsel specifically objected to the evidence of R.W. at trial, we agree with defendant that this evidence was not admissible pursuant to section 115-7.3, if for no other reason than the record provides no evidence of R.W.'s age, which is critical to establishing whether this touching was evidence of defendant's commission of some form of criminal sexual abuse. Nevertheless, this admission of evidence, even if preserved for review, was harmless.

¶ 107 The improper admission of other-crimes evidence is harmless error if the defendant is not prejudiced by its admission. *People v. Gregory*, 2016 IL App (2d) 140294, ¶ 28. Reversal is required only where the evidence was a material factor in the defendant's conviction; that is, the

outcome of his trial would likely have been different had the evidence been excluded. *People v. Cavazos*, 2022 IL App (2d) 120444-B, ¶ 71.

¶ 108   Here, the evidence involving R.W. was not a material factor in defendant's conviction. Bosshart did not testify to defendant's statements about R.W. at trial, nor did R.W. testify at trial. The only evidence before the jury of R.W. was a short back-and-forth in defendant's recorded interview, between the properly admitted other crimes involving J.K. and A.D. At trial, R.K. testified to defendant fondling his penis, and defendant did not deny touching R.K. The only issue was whether defendant's actions were the result of involuntary intoxication. Given the strongly probative other-crimes evidence already before the jury, the erroneous admission of defendant's short statement of a single incident of unintentional touching did not render his trial unfair.

¶ 109                               B. Sufficiency of the Evidence

¶ 110   Defendant argues that he sufficiently raised an involuntary intoxication affirmative defense based on his ingestion of Ambien, and that the State failed to prove beyond a reasonable doubt that he was not involuntarily intoxicated or drugged when he touched R.K. Citing *People v. Hari*, 218 Ill. 2d 275 (2006), defendant argues that involuntary intoxication includes drugged conditions where a defendant experiences an unexpected adverse side effect of a prescription medication. He contends that after he sufficiently raised the affirmative defense, the State failed to prove beyond a reasonable doubt that he was not involuntarily intoxicated. He points to R.K.'s testimony that he thought defendant was asleep. He continues that the only evidence the State put forward was evidence of defendant's inappropriate acts against other children.

¶ 111   Defendant also asks us to consider why defendant would admit to bad acts against J.K. and even worse behavior with A.D. but be unable to recollect fondling R.K. He suggests that the explanation is simple: Defendant told the truth about being under the effects of Ambien.

¶ 112   On a challenge to the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Murray*, 2019 IL 123289, ¶ 19.

¶ 113   When the defendant raises an affirmative defense, the State must also disprove the affirmative defense beyond a reasonable doubt. *People v. Lewis*, 2020 IL App (2d) 170900, ¶ 47. To raise an affirmative defense, a defendant must present sufficient evidence, which has been described as "slight" or "some" evidence to support the affirmative defense. *People v. Washington*, 326 Ill. App. 3d 1089, 1093 (2002).

¶ 114   Illinois provides an affirmative defense to criminal conduct where a person is in an intoxicated or drugged condition that is involuntarily produced, and the condition deprives that person of substantial capacity to either appreciate the criminality of their conduct or to conform their conduct to law. 720 ILCS 5/6-3 (West 2020). We agree with defendant that, per our supreme court's decision in *Hari*, 218 Ill. 2d at 292, the statutory term "involuntarily produced" includes "an unexpected adverse side effect of a prescription drug that was unwarned by the prescribing doctor, the [Physician's Desk Reference,] or the packaging insert." Consistent with *Hari*, defendant sufficiently raised the affirmative defense of involuntary intoxication.

¶ 115 Nevertheless, we hold that the evidence was sufficient to convict defendant of aggravated criminal sexual abuse of R.K. Defendant does not dispute his or R.K.'s age at the time of the alleged offense, and he does not deny or contradict R.K.'s testimony. The only dispute was whether defendant was involuntarily intoxicated.

¶ 116 Here, the State produced other-crimes evidence that went to both defendant's criminal propensity and his state of mind. Defendant admitted to fondling J.K.'s and A.D.'s penises multiples times over and under their clothing, and he admitted to having a problem with touching children. Defendant was accused of committing similar bad acts with R.K., and the State presented evidence of defendant repeatedly fondling R.K.'s penis over and under his clothing. This was strong evidence from which the jury could find that defendant knowingly fondled R.K.'s penis and that his actions were not the product of a drugged condition.

¶ 117 Furthermore, the evidence of defendant's drugged condition was weak. The State's cross-examination of defendant elicited testimony that he did not know on what days he took Ambien, that he had only 30 doses, which lasted him over a year before he received a second prescription, and that he never reported any side effects of Ambien to a doctor. Although R.K. initially thought that defendant was sleeping when he fondled him because his eyes were closed, defendant's repeated touching led R.K. to tell his mother that he did not believe defendant had been sleeping. Defendant's repeated fondling of R.K.'s private area even after R.K. had removed his hand several times was evidence from which a jury could infer a knowing state of mind as opposed to a drugged condition. In addition, while Stefanik's direct testimony provided that Ambien could cause a person to perform complex behaviors like sleep-driving, sleep-eating, or sleep-sex, his cross-examination revealed that only 1 to 5% of individuals reported any type of complex activity occurring as a side effect of Ambien. Especially combined with the State's other-crimes evidence,

the jury could have reasonably inferred beyond a reasonable doubt that defendant's fondling of R.K. was not the product of an involuntarily produced drugged condition.

¶ 118   Finally, we disagree with defendant that the only reasonable inference we can draw from defendant admitting to fondling J.K. and A.D. but not R.K. is that he must have been involuntarily intoxicated. Although his argument has intuitive appeal, it was reasonable for the jury to believe defendant lied to Bosshart or simply did not remember for another reason. For instance, the jury could have reasonably inferred that defendant believed his actions against R.K. were the only bad acts he could defend by claiming he was on Ambien, given that he touched R.K. while lying in bed with his eyes closed. We are mindful that it is the jury, not us, who is responsible for resolving conflicts in the testimony, weighing of the evidence, and drawing reasonable inferences from the facts. *People v. Delhaye*, 2021 IL App (2d) 190271, ¶ 75. In sum, the evidence was sufficient because the jury heard testimony from which it could have reasonably concluded that defendant had substantial capacity to understand the criminality of his actions against R.K. when he fondled his penis.

¶ 119                                  C. Closing Argument

¶ 120   Defendant also argues that he was denied a fair trial by four errors in the State's comments at closing argument, both by the individual errors themselves and by their cumulative effect. First, he contends that the State mischaracterized Stefanik's testimony when it argued that, since R.K. had testified that he believed defendant was asleep, defendant must not have been under the effects of Ambien. The State was referencing Stefanik's testimony that, if someone were to observe a person engaging in an Ambien-induced sleep-activity, they would appear to be conscious, such as by having their eyes open when sleep-driving.

¶ 121   Second, defendant argues that the State prosecutor improperly offered their opinions to argue about the FDA's findings on Ambien. In particular, defendant takes exception to the prosecutor's statements that the FDA included the side effect to be "better safe than sorry" and that the jury did not "have to believe [that automatism] actually occurs."

¶ 122   Third, defendant argues that the State improperly characterized defendant as an "animal" in order to anger and inflame the jury when it repeatedly referred to him as a wolf in sheep's clothing.

¶ 123   Last, defendant argues that the State misstated the law when it told the jury that, to find defendant was involuntarily intoxicated, it had to find that someone forced him to take Ambien. The State argued that defendant took Ambien "full well knowing how it affected him," and that "[n]obody forced him," to take it, so "it wasn't involuntary."

¶ 124   Prosecutors are afforded a great deal of latitude in closing argument. *People v. Schneider*, 275 Ill. App. 3d 734, 755 (2007). Prosecutors may comment on the evidence and the reasonable inferences drawn from the evidence, responded to comments by defense counsel, and comment on the credibility of witnesses, but they must not misstate the evidence or argue facts not in evidence. *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 47. Prosecutors may not make argument that has no purpose but to inflame the jury or that comments on issues irrelevant to the question of guilt or innocence (*Schneider*, 275 Ill. App. 3d at 755), and a prosecutor's personal opinion about a case is generally improper (*People v. Theis*, 2011 IL App (2d) 091080, ¶ 52).

¶ 125   In reviewing whether the prosecutor's remarks were improper, we view the closing argument in its entirety and put the alleged improper remarks in context. *People v. Deramus*, 2014 IL App (1st) 130995, ¶ 36. In general, an improper closing argument will constitute reversible

error only if there is doubt that the jury would have found defendant guilty absent the improper remarks. *Schneider*, 275 Ill. App. 3d at 755.

¶ 126   Defendant acknowledges that defense counsel did not object to any of the claimed errors at closing, and he urges us to review for plain error. The plain-error doctrine allows for review of unpreserved errors affecting substantial rights. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1970); see also *People v. Carbajal*, 2013 IL App (2d) 111018, ¶ 27. The first step in a plain error analysis is to determine whether a clear or obvious error occurred. *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010). If we find that there was an unpreserved error, then defendant must demonstrate either (1) that the evidence was so closely balanced that the error alone threatened to tip the scales of justice against him, or (2) that the error was so serious that it affected the trial's fairness and challenged the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 127   The first prong of plain error requires a similar inquiry to harmless-error review, with the important distinction that, to show plain error, the defendant bears the burden of persuasion to show prejudice. *People v. Thurrow*, 203 Ill. 2d 352, 363 (2003). Under the second prong of plain error, our supreme court has equated the required error to a "structural error," where prejudice is presumed. *People v. Moon*, 2022 IL 125959, ¶¶ 27-28. Defendant argues plain error under both prongs.

¶ 128   We reject defendant's arguments. First, the State did not mischaracterize Stefanik's testimony. Stefanik testified that individuals performing complex activities as a side effect of Ambien may appear conscious to others, and thus the State was making a reasonable inference from the fact that R.K. initially thought defendant was asleep to argue that he was not experiencing a serious side effect of Ambien. We note that defense counsel also referenced Stefanik's testimony

at closing, reminding the jury that although a person on Ambien may appear to be awake, they would not be engaged in conscious behavior.

¶ 129   Nor did the prosecutor offer a personal opinion on the FDA's Ambien findings. The prosecutor argued based on Stefanik's testimony—specifically, that the FDA relied on individuals to self-report side effects of Ambien as opposed to conducting laboratory studies. The prosecutor acknowledged that the FDA warned of automatism as a side effect of Ambien but argued that the jury did not have to believe it occurs. The context of these comments was the State's argument that defendant was lying about taking Ambien or its effect on him, and it was proper for the prosecutor to ask the jury, as arbiters of witness credibility, to disbelieve defendant based on the evidence presented at trial.

¶ 130   We turn next to the prosecutor's repeated reference to defendant as an animal. At the outset of closing argument, the prosecutor said that defendant was "what we call a wolf in sheep's clothing," and the prosecutor returned to this theme throughout closing argument. Early in closing argument, the prosecutor said that, after defendant gained the trust of R.K.'s family and stayed at their home, "his sheep clothes came off. He turned into a wolf. *** And you watched the video *** and you saw the impact of this wolf on [R.K.]." Later in argument, the prosecutor stated that defendant was "dressed as a sheep," while forming his relationship with R.K. Near the end of argument, the prosecutor characterized defendant's "MO" as "[t]he sheep in wolf's clothing [*sic*]. The person who befriends a single mother, worms their way into their lives and then touches *** their young male children inappropriately time and time again." The prosecutor asked the jury to consider that "when this defendant takes his clothes off, he's really a child molester, that wolf." In rebuttal, the prosecutor returned to its theme, telling the jury that defendant was "being the sheep" when he faked being asleep with R.K.:

"He wanted to portray himself being the sheep, the good guy. He wouldn't do something like that. And he wanted [R.K.] to feel that way because he's faking being asleep. That's why he faked being asleep. To say that he's on Ambien and he was in a drugged condition, based on the evidence you heard in this case, is ridiculous."

¶ 131 We agree with defendant that such comments were improper. Our supreme court has held that it is improper to characterize a defendant as an "animal," even if the characterization is based on the evidence. *People v. Johnson*, 119 Ill. 2d 119, 139 (1987); see also *People v. Johnson*, 208 Ill. 2d 53, 80 (2003) (The State improperly likened the defendant to an animal when it commented, "If you run with the pack, you share the kill."); *People v. Mpulamaska*, 2016 IL App (2d) 130703, ¶ 109 (holding it was improper to depict the defendant as a "predator" who took a "piece of meat" home with him). Specifically, the appellate court has found error when the State directly refers to the defendant as a "wolf in sheep's clothing." *People v. Ivory*, 333 Ill. App. 3d 505, 516-17 (2002); *cf. People v. Liddell*, 240 Ill. App. 3d 229, 234-35 (1992) (finding that closing argument was not improper where the State did not refer directly to the defendant as the wolf in sheep's clothing).

¶ 132 Here, from the outset of the State's closing argument through the rebuttal, the prosecutor repeatedly used the improper wolf-in-sheep's-clothing metaphor to directly characterize defendant throughout closing argument. The law in Illinois is clear that a prosecutor should not do this, and we admonish the prosecutor in this case to avoid similar improper comments in the future. Such prosecutorial error risks reversal for no apparent gain. Having found clear error, we proceed to examine whether the error constituted plain error under either prong.

¶ 133 Turning to the first prong, the evidence in this case was not closely balanced. The jury heard uncontradicted testimony that defendant fondled R.K.'s penis. The jury further heard properly admitted other-crimes evidence that defendant had a pattern of knowingly and

intentionally fondling other young boys' penises in the same manner that he fondled R.K.'s. Beyond the other-crimes evidence showing defendant's propensity to fondle young boys, the evidence was probative of defendant's knowing state of mind when fondling R.K., which defendant put at issue by raising an involuntary intoxication defense. Moreover, the record is devoid of evidence as to when defendant took Ambien and whether he ever experienced such serious side effects. Defendant's own expert admitted that only 1 to 5% of Ambien users reported any form of automatism as a side effect, making it unlikely that defendant was experiencing such a serious side effect when he touched R.K., even if the jury believed he was on Ambien at the time.

¶ 134   As to the second prong, a prosecutor's improper comments referring to a defendant as an animal is not structural error which automatically renders a trial unfair. Even when such an error is preserved, it is reviewed for harmless error. *E.g.*, *Ivory*, 333 Ill. App. 3d at 517; *People v. Balls*, 95 Ill. App. 3d 70, 77 (1981) (the prosecutor's reference at closing argument to the defendant as an "animal" was not a material factor in the defendant's conviction because of the overwhelming evidence of the defendant's guilt). This court has stated that if we do not automatically reverse in light of a preserved misstatement, we certainly may not automatically reverse in light of a forfeited one. *People v. Burman*, 2013 IL App 110807, ¶ 46.

¶ 135   Last, we turn to whether the State misstated the law of defendant's involuntary intoxication defense. On the one hand, the State did not misstate the law of the involuntary intoxication defense because the prosecutor did not tell the jury that it had to find that someone forced defendant to take Ambien. See *Hari*, 218 Ill. 2d at 294-95 (adopting a broader interpretation of "involuntarily produced" to include more than trick, artifice, or force). On the other hand, the prosecutor's remarks were a red herring because it was never the defense's theory that someone had forced or tricked defendant to take Ambien, and closing argument should be limited to comments relevant

to the question of the defendant's guilt or innocence. *Schneider*, 275 Ill. App. 3d at 755; see *People v. Williams*, 2015 IL App (1st) 122745, ¶ 12 (prosecutors are allowed to comment on the evidence presented and the credibility of the defense's theory of the case). Thus, although the State did not misstate the law, it erred by stating the law for no purpose other than to mislead or distract the jury.

¶ 136  Nevertheless, the error did not amount to plain error under either prong. As explained *supra* ¶ 133, the evidence was not closely balanced, and we note that the trial court properly instructed the jury on defendant's involuntary intoxication defense. In addition, a prosecutor's comments do not automatically render a trial unfair. See *People v. Macri*, 185 Ill. 2d 1, 62 (1998) ("[A] prosecutor's comments in closing argument will result in reversible error only when they engender 'substantial prejudice' against the defendant ***."). Finally, the cumulative effect of the State's two errors in closing argument does not change our plain error analysis, because the evidence still was not closely balanced, and the limited errors were not of the type to render his trial fundamentally unfair. Therefore, defendant was not denied a fair trial by the State's closing argument.

¶ 137                                III. CONCLUSION

¶ 138  For the reasons stated, we affirm the judgment of the Kane County circuit court.

¶ 139  Affirmed.