No. 1–00–0760   First Division

August 26, 2002

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County. 

)

) 97 CR 20768

)

JAVELL IVORY, ) The Honorable

) Henry R. Simmons,

Defendant-Appellant. ) Judge Presiding.

PRESIDING JUSTICE COHEN delivered the opinion of the court:

Following a jury trial, defendant Javell Ivory was found legally accountable (720 ILCS 5/5-2(c) (West 2000)) for two counts of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 1996)) and two counts of first degree murder (720 ILCS 5/9-1(a)(3) (West 1996)).  Defendant was sentenced to consecutive terms of 30 years' imprisonment on each charge of aggravated battery with a firearm and sentenced to natural life imprisonment for each charge of first degree murder.  Defendant appeals, arguing: (1) the State failed to prove defendant guilty of the crimes charged beyond a reasonable doubt; (2) defendant was prejudiced by the admission into evidence of certain weapons and ammunition; (3) the trial court erred in allowing inadmissible hearsay evidence; (4) the trial court erred in permitting testimony that one of the murder victims left behind a child; (5) defendant was deprived of his right to a fair trial by improper prosecutorial comment comparing defendant to an animal; and (6) the trial court's order that defendant's sentences be served consecutively violates the rule announced in 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).  For the following reasons, we affirm.

BACKGROUND

The evidence presented at trial revealed that a street gang known as the Mafia Insane Vice Lords controls an area just west of Cicero Avenue along Adams Street in Chicago.  A rival gang known as the Undertaker Vice Lords controls an area east of Cicero Avenue along Adams Street.  On June 22, 1997, Joshua Thomas, Salada Smith, Robert Carr and Derrick Wandrick were gathered around Carr's automobile talking at a gas station located on the northeast corner of Cicero Avenue and Adams Street when a group drove by in a van and began shooting.  Thomas and Smith were killed; Carr and Wandrick were wounded.  

Detective Dominick Rizzi testified that he and his partner, Detective Alan Jaglowski, were the lead detectives investigating the shooting.  After receiving information regarding possible suspects early on June 24, 1997, Detectives Rizzi and Jaglowski located and spoke with Paris Williams.  Over defendant's objection, Detective Rizzi testified that after speaking with Williams, he and Detective Jaglowski "proceeded to several locations in the neighborhood and *** learned of addresses of possible offenders."  Defendant, Sherron Dillon, Darnell Foxx, and Tyreece Roberts (all members of the Mafia Insane Vice Lords) were arrested in connection with the shooting.  Kevin Tucker, a fifth Mafia Insane Vice Lord, was apprehended a year later.

At approximately 10 a.m. on June 24, 1997, Detective Jaglowski spoke with defendant.  Defendant told Jaglowski that at some time prior to the shooting in the instant case defendant was present with a group of individuals at a beef stand when an individual arrived who wanted to become a member of the Mafia Insane Vice Lords.  According to Jaglowski, defendant indicated that the group at the beef stand was "assigned to go steal a van" so that the van could be used to "roll on another gang."  Jaglowski testified that  to "roll on another gang" meant to hunt for other gang members.  Defendant admitted to Detective Jaglowski that he participated in stealing a van and later learned that the van which he had helped steal was used for the shooting in the instant case.  Defendant told Jaglowski that he was a member of the Conservative Vice Lords street gang and denied being present for the shooting. 

At approximately 4 p.m. on June 24, 1997, Detective Rizzi spoke with defendant.  Over defendant's objection, Detective Rizzi testified that he informed defendant that he had just spoken with Roberts and Dillon.  After Detective Rizzi gave defendant "a summary or brief review of some of the facts" that he learned in his conversations with Roberts and Dillon, defendant admitted to Detective Rizzi that he had gotten "into a van with some of his friends and they were going to do a shooting."  Defendant told Detective Rizzi that Roberts drove the van, Foxx (the front seat passenger) was armed with an Intertech 9-millimeter semi-automatic pistol, and defendant, Dillon and Tucker were in the backseat.  The group drove to Tucker's home where Tucker picked up an S.K.S. rifle.  The group then proceeded to the corner of Cicero Avenue and Adams Street.  After confirming the presence of an Undertaker Vice Lord, Foxx and Tucker began shooting.

At approximately 11 p.m. that evening, Assistant State's Attorney (ASA) Thomas Mahoney and Detective Rizzi spoke with defendant regarding the shooting.  At the conclusion of the conversation, ASA Mahoney told defendant that they could memorialize their discussion either by preparing a handwritten statement or by arranging to have a court reporter record and transcribe the conversation.  Defendant opted for a handwritten statement.

ASA Mahoney and Detective Rizzi met with defendant again at approximately 3:30 a.m. on June 25, 1997, to prepare the handwritten statement.
  
ASA Mahoney first spoke with defendant alone to ask whether defendant had any complaints about his treatment by the police.  Defendant denied having any complaints.  Detective Rizzi then entered the room and ASA Mahoney handwrote a summary of the 11 p.m. conversation.  After writing out the statement, ASA Mahoney first had defendant read some paragraphs aloud to verify that defendant was able to read and was able to decipher ASA Mahoney's handwriting.  Then ASA Mahoney read the statement aloud and defendant was given the opportunity to make any changes or corrections that he wished.  ASA Mahoney, Detective Rizzi, and defendant each signed at the bottom of each page after corrections were made. 

Defendant's written statement was read aloud to the jury at trial and reads, in pertinent part as follows:

"[Defendant] states that he is seventeen years old and his birth date is January 15, 1980.  [Defendant] states that he can read and write English and that he is going into the twelfth grade at Von Steuben High School in Chicago.

[Defendant] states he's a member of the Mafia Insane Vice Lords Street Gang.  [Defendant] states that his nickname is Vello.  [Defendant] states that he lives at 4914 West Monroe on the first floor.

[Defendant] states that on June 22, 1997 he was with some other Mafia Insane Vice Lords out in front of his house at 4914 West Monroe.  [Defendant] states that Kevin Tucker whose nickname is K.E., Darnell Foxx, whose nickname is Buggy, Sherron Dillon, whose nickname is Ron, Tyreece Roberts, whose nickname is Half Pint, were outside at about 12:30 a.m.

[Defendant] states that he was carrying a loaded .22 caliber pistol when he was outside.  [Defendant] states that Buggy and Kevin Tucker wanted to shoot some Undertaker Vice Lords.  [Defendant] states that Buggy had driven by the gas station at Cicero and Adams and saw some Undertaker Vice Lords in the lot.

[Defendant] states that the Mafia Insane Vice Lords and the Undertake Vice Lords are rivals.  [Defendant] states that the Mafia Insane Vice Lords and the Undertaker Vice Lords have been fighting for about four months.

[Defendant] states that after Buggy drove by the gas station Buggy, Kevin Tucker, Sherron Dillon, Half Pint and himself went into a van which was parked nearby.  [Defendant] states that he had his gun with him.

[Defendant] states that Buggy had a Tech .9 millimeter gun and sat in the front.  [Defendant] states that Kevin Tucker drove the van over to his house on Quincy and went to his grandmother's on the first floor.  [Defendant] states that Kevin Tucker went to the basement and came out with a S.K.S. rifle in a garbage bag.

[Defendant] states that he waited in the van with Buggy, Half Pint, and Sherron Dillon.  [Defendant] states that Kevin Tucker got in the back of the van and took the S.K.S. rifle out of the bag.  [Defendant] states that Half drove the van over to Adams and Cicero and drove by the gas station and went around the block.

[Defendant] states that he knew they were going to shoot some Undertaker Vice Lords at the gas station.  [Defendant] states that after they drove around the block and pulled up to the gas station [defendant] states that an Undertaker Vice Lord named Derrick was standing by a car with three or four other people at the gas station.

[Defendant] states that Kevin Tucker threw open the side door to the van and pointed the rifle out the door and began shooting at the people in the gas station.  [Defendant] states that Buggy pointed his gun out the window and began shooting at the people.

[Defendant] states that Buggy fired about four shots and Kevin Tucker fired about ten or fifteen times.  [Defendant] states that after the shooting stopped Half Pint drove off real fast down Cicero then turned left on Adams.

[Defendant] states that he got out of the van with Buggy and they ran in separate directions.  [Defendant] states that he ran home to 4914 West Monroe and went into his house.

[Defendant] states that the next day, at about 12:30 or 1:00 o'clock in the afternoon he saw Buggy, Half Pint and Sherron Dillon on his block.  [Defendant] states they saw Paris Williams who said y'all got them [racial epithet] last night.

[Defendant] states that Paris Williams is a Mafia Insane Vice Lord.  [Defendant] states that Buggy, Half Pint, Sherron and him talked about the shooting and that a lady got shot."

In his written statement defendant additionally identified photographs of the Intertech 9-millimeter semi-automatic pistol, the S.K.S. rifle and Kevin Tucker.  These photographs were admitted into evidence at trial.

Police recovered an S.K.S. assault rifle and an assortment of ammunition from Tucker's residence at 5018 Quincy in Chicago.  The police also searched both the first and second floor apartments at 4914 West Monroe where defendant and Foxx respectively resided.  Police recovered additional ammunition from defendant's apartment and, led by Foxx's mother, recovered an Intertech 9-millimeter semi-automatic pistol from inside a diaper bag under the back porch at 4914 W. Monroe.  Police also recovered a .38-caliber pistol from Roberts' house.

Beth Patty, a firearm identification expert, testified that she was able to determine that a 9-millimeter bullet recovered from Thomas' body had been "fired by the Intertech" pistol "to the exclusion of every other gun in the world."  Patty determined that a bullet recovered from Thomas' hospital cart had been fired from the S.K.S. rifle, again "to the exclusion of every other gun in the world."  Patty testified to the same degree of certainty that one bullet recovered from Smith's body had been fired from the S.K.S. rifle and another from the Intertech pistol.  Finally, Patty determined that the 9-millimeter casings recovered from the driveway of the gas station could have been fired by the Intertech pistol.

Though no evidence was presented that defendant personally fired any of the weapons, had acted as a lookout, or otherwise actively participated in the shooting, the State argued that defendant was accountable for the shootings because he aided and abetted his companions.  The jury found defendant guilty beyond a reasonable doubt of two counts of first degree murder (for the deaths of Smith and Thomas) and two counts of aggravated battery with a firearm (for the shooting of Carr and Wandrick). Defendant's posttrial motion for a new trial was denied.  

Defendant was sentenced to consecutive terms of natural life imprisonment on each of the first degree murder charges and 30 years' imprisonment for each of the aggravated battery charges.  Defendant's motion to reconsider his sentence was denied and this appeal followed.

ANALYSIS

I.  Reasonable Doubt

On appeal, defendant first argues that the State failed to prove him guilty beyond a reasonable doubt. Defendant does not contend that the evidence was insufficient to establish that Foxx and Turner were guilty of first degree murder and aggravated battery with a firearm.  Rather, defendant argues that the State failed to present sufficient evidence to establish that defendant was legally accountable for the actions of Foxx and Turner.  In reviewing the sufficiency of the evidence to support a criminal conviction, our inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.
  People v. Collins
, 106 Ill. 2d 237, 261 (1985).  

Section 5–2(c) of the Criminal Code of 1961 provides that a person is legally accountable for the criminal conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."  720 ILCS 5/5–2(c) (West 1996).  To prove that the defendant possessed the intent to promote or facilitate the crime, the State may present evidence which establishes beyond a reasonable doubt that: (1) the defendant shared the criminal intent of the principal; or (2) there was a common criminal design.  
People v. Williams
, 193 Ill. 2d 306, 338 (2000).

A defendant's intent may be inferred from the nature of his actions and the circumstances accompanying the criminal conduct.  
Williams
, 193 Ill. 2d at 338.  Under the common design rule, if two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts.  
In re W.C.
, 167 Ill. 2d 307, 337 (1995).  Words of agreement are not needed to establish a common design.  
Williams
, 193 Ill. 2d at 338.  Accountability may be established through a person's knowledge of and participation in the criminal scheme, even though there is no evidence that he directly participated in the criminal act itself.  
People v. Perez
, 189 Ill. 2d 254, 267 (2000).

Defendant correctly notes that mere presence at the scene of a crime, even when combined with knowledge that a crime is being committed and flight from the scene, is insufficient to establish guilt by accountability.  
Williams
, 193 Ill. 2d at 339.  However, proof that defendant: (1) was present during the preparation of the offense; (2) fled from the scene of the crime; (3) maintained a close affiliation with his companions after the commission of the crime; and (4) failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability.  
Perez
, 189 Ill. 2d at 267.  Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of the group's design supports an inference that defendant shared the group's common purpose and is sufficient to sustain his conviction for an offense committed by another group member.  
Williams
, 193 Ill. 2d at 339.

In the case before us, the State presented uncontroverted evidence that defendant knew of the plan to shoot members of the Undertaker Vice Lords and voluntarily accompanied his companions to the scene of the crime.  In his written statement, defendant admitted that–knowing the group planned to shoot Undertaker Vice Lords and  armed with a .22-caliber handgun–defendant voluntarily accompanied the group to the van from which the plan was carried out.  Defendant further admitted that he met with Dillon, Foxx, and Roberts the following day and discussed the shooting.  Defendant's own statement clearly establishes that defendant voluntarily attached himself to a group bent on illegal acts with knowledge of the group's design and then maintained a close affiliation with his companions after the commission of the crime. Such evidence is sufficient to prove defendant's guilt based on accountability beyond a reasonable doubt. 
Williams
, 193 Ill. 2d at 339;
 Perez
, 189 Ill. 2d at 267. 

II.  Admissibility of Evidence

Defendant next argues that he was prejudiced by the improper admission into evidence of certain weapons and ammunition.  Defendant has waived this issue by failing to either object at trial or raise the matter in a timely posttrial motion.  See 
People v. Enoch
, 122 Ill. 2d 176, 190 (1988).  In his reply brief, defendant urges this court to address the issue as plain error.  134 Ill. 2d R.  615(a). 

Plain error is a limited and narrow exception to the general waiver rule, to be invoked only where: (1) the evidence is closely balanced; or (2) the alleged error is so substantial that it deprived the defendant of a fair trial.   
People v. Kuntu
, 196 Ill. 2d 105, 128 (2001).  Defendant argues this exception is applicable because "the evidence was so closely balanced (with no evidence of [defendant's] participation)."  As noted above, accountability may be established through a person's knowledge of and participation in the criminal scheme, even though there is no evidence that he directly participated in the criminal act itself.  
Perez
, 189 Ill. 2d at 267.  The evidence of defendant's guilt based on accountability–which includes his confession–was unrebutted at trial.  We do not find that the evidence was closely balanced.  Defendant is not entitled to plain error review under the first prong of the exception.  

The " 'second prong of the plain error exception is to be invoked only where the possible error is so serious that its consideration is "necessary to preserve the integrity and reputation of the judicial process." ' [Citations.]" 
Kuntu
, 196 Ill. 2d at 128, quoting 
People v. Hampton
, 149 Ill. 2d 71, 102 (1992).  Although defendant argues that "the improper admission of the weapons evidence denied [defendant] a fair trial," he fails to "explain[] why the error is so severe that it must be remedied to preserve the integrity of the judicial process" (
People v. Nieves
, 192 Ill. 2d 487, 503 (2000).  Accordingly, we find that this argument is waived.  
Nieves
, 192 Ill. 2d at 503.    We decline defendant's request to review this issue as plain error.

III.
  
Hearsay

Defendant next argues that he was denied his right to a fair trial when the trial court permitted Detective Rizzi to testify that: (1) after speaking with Paris Williams, Detective Rizzi and his partner "proceeded to several locations in the neighborhood and *** learned of addresses of possible offenders"; and (2) defendant agreed to make a statement after Detective Rizzi informed defendant of information received from Roberts and Dillon.  Defendant contends that Detective Rizzi's testimony amounted to inadmissible "indirect hearsay" because Detective Rizzi "gratuitously revealed the substance of the statements given by out-of-court declarants."

A.  Rizzi's conversation with Williams

Hearsay is testimony or written evidence of an out-of-court statement offered to establish the truth of the matter asserted and is generally inadmissible.  
People v. Brooks
, 297  Ill. App. 3d 581,  583 (1998).   A police officer's testimony recounting steps taken in the course of an investigation does not constitute inadmissible hearsay–"even though the officer's description of the progress of the case might suggest that nontestifying witnesses implicated the defendant" (
People v. Johnson
, 116 Ill. 2d 13, 24 (1987))–unless "the testimony *** gratuitously reveal[s] the substance of *** statements [made by nontestifying witnesses] and so inform[s] the jury that [nontestifying witnesses] told the police that the defendant was responsible for the crime" (
People v. Henderson
, 142 Ill. 2d 258, 304 (1990)).

Defendant argues that "the only conclusion" to be drawn from Detective Rizzi's testimony that he proceeded to the addresses of possible offenders (including defendant) after talking to Williams is that Williams "fingered" defendant and therefore Detective Rizzi "gratuitously reveal[ed] the substance" of Williams' statement.  We disagree.  Nothing in Detective Rizzi's testimony reveals what, if anything, Williams told the detective about defendant or the shooting.  Rather, Detective Rizzi's testimony simply indicates that, after speaking to Williams, Detective Rizzi learned the addresses of possible offenders.  At most, this testimony suggests that the detective began looking for defendant as a result of William's statement.  Testimony regarding the progress of an investigation is admissible "even if a jury would conclude that the police began looking for a defendant as a result of what nontestifying witnesses told them, as long as the testimony does not gratuitously reveal the substance of their statements."  
Henderson
, 142 Ill. 2d at 304.  The "mere fact that one of the many inferences which the jurors could have drawn" was that Williams implicated defendant does not render Detective Rizzi's testimony inadmissible.  
Henderson
, 142 Ill. 2d at 303-04.  Because Detective Rizzi never revealed the substance of any statement made by Williams, his testimony that he spoke with Williams did not contain hearsay and did not deprive defendant of his right to a fair trial.

B.  Statements of Roberts and Dillon

Defendant further claims that Detective Rizzi's testimony gratuitously revealed the substance of statements made by Roberts and Dillon because the only possible inference to be drawn is that Roberts and Dillon named defendant as an offender.  It is well-established that an out-of-court statement not offered for the truth of the matter asserted is not hearsay.  
People v. Simms
, 143 Ill. 2d 154, 173 (1991).  Evidence of prior out-of-court statements offered to show that a person did something as a reaction to the statements does not violate the hearsay rule.  
People v. Fauntleroy
, 224  Ill. App. 3d 140, 147 (1991).  It is clear from the record that Detective Rizzi's testimony that he provided defendant with " a summary or brief review" of facts gleaned from Roberts' and Dillon's statements was not offered to prove the truth of those statements but, rather, to explain why defendant decided to change his original story and confess to his role in the shooting. 
 The trial court did not err in allowing Detective Rizzi to testify that he provided defendant with a summary of Roberts' and Dillon's statements.  
Fauntleroy
, 224  Ill. App. 3d at 147.

IV.  Victim's Family

Defendant next argues that the trial court erred in permitting testimony that one of the murder victims left behind a child.  Having failed to object to this testimony at trial, defendant has waived this claim of error.  
People v. Enoch
, 122 Ill. 2d 176, 186 (1988).  Defendant does not assert that this issue is reviewable as plain error.

V.  Improper Prosecutorial Comment

Defendant next complains that he was deprived of a fair trial based on improper comment by the State during closing argument.  Specifically, defendant objects to the following passage:

"And, ladies and gentlemen, today [defendant is] all dressed up in his nice wool suit.  Well, judge him for the person he was on June 22, 1997.  Right now, he's just a wolf in sheep's clothing.  And on June 22, 1997, when they decided to go to that gas station, he was part of a pack of predators, and when you run with the pack, you share in the kill."  

While prosecutors are afforded wide latitude in closing argument, prosecutors may not engage in inflammatory arguments designed solely to arouse the passions of the jury.  
People v. Armstrong
, 183 Ill. 2d 130, 145 (1998).  Closing arguments must be viewed in their entirety, and remarks must be viewed in context.  
Armstrong
, 183 Ill. 2d at 146.  A trial court's determination regarding the propriety of closing arguments will not be disturbed absent an abuse of discretion.  
Armstrong
, 183 Ill. 2d at 145.  

The State, relying on this court's decision in 
People v. Liddell
, 240  Ill. App. 3d 229, 234 (1992), argues that the prosecutor's comments were not improper. In 
Liddell
, the prosecutor made the following comments during closing rebuttal argument:

"'You saw the defendant testify yesterday.  He was in a suit and a tie.  He looked good.  Did you ever hear a story of the wolf in sheep's clothing?

* * *

The funny thing about wolves, they not only like to wear a lamb's clothing;  they like to run in packs.' " 
Liddell
, 240  Ill. App. 3d at 234. 

The majority in 
Liddell
 suggested that the State never "directly" referred to the defendant as an animal; rather, "the State was merely attempting to persuade the jurors to not be deceived by defendant's appearance during trial" and "[t]he reference to 'pack' was to convey to the jurors that defendant was part of a group working in concert with one another."  
Liddell
, 240  Ill. App. 3d at 234-35.  The majority concluded that the prosecutor's comments were not improper.
(footnote: 1)
 In the instant case, there is no question that the prosecutor directly referred to defendant as an animal.  Specifically, the prosecutor commented that "he's [defendant is] just a wolf in sheep's clothing" and defendant "was part of a pack of predators."  As our supreme court has explicitly and unequivocally held that referring to defendant as an animal is improper (
People v. Johnson
, 119 Ill. 2d 119, 139 (1987)), we find the trial court erred in overruling defendant's objection to this comment.

Nonetheless, " '[i]mproper remarks generally do not constitute reversible error unless they result in substantial prejudice to the accused.' " 
Johnson
, 119 Ill. 2d at 139-40, quoting 
People v. Tiller, 
94 Ill. 2d 303, 321 (1982).  We have already noted that the evidence of defendant's guilt–based in substantial part on defendant's own confession–was overwhelming.  Further, viewing the improper comment in the context of the closing argument as a whole (
Armstrong
, 183 Ill. 2d at 146), we note that the objectionable commentary was contained in a single "isolated [passage] and was not dwelled upon further by the prosecutor" (
Johnson
, 119 Ill. 2d at 140).  We therefore conclude that the improper characterization of defendant as a wolf did not rise to the level of reversible error.

VI.  
Apprendi

Finally, defendant contends that the consecutive sentences imposed in this case violate the rule announced in 
Apprendi v. New Jersey
, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 455, 120 S. Ct. 2348, 2362-63 (2000) , that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt."  The Illinois Supreme Court has held, however, that "[b]ecause consecutive sentences remain discrete, a determination that sentences are to be served consecutively cannot run afoul of 
Apprendi
."  
People v. Wagener
, 196 Ill. 2d 269, 286 (2001).  Defendant's argument to the contrary is thus without merit.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

McNULTY and COUSINS, JJ., concurred.

FOOTNOTES
1:

 But see 
Liddell
, 240  Ill. App. 3d at 235 (Manning, J., specially concurring) (concluding that the State's "implication" that "defendant behaved like a wolf, running in packs" was "no different than directly calling a defendant an animal" but that this improper comment did not amount to reversible error under the facts of that case).