NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 230416-U

NO. 4-23-0416

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 15, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| JOHN CASEY BARNES, | ) | No. 05CF4018 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Robert Randall Wilt, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Harris and Lannerd concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The appellate court affirmed, finding the trial court did not err in granting the State's motion to dismiss defendant's amended postconviction petition at the second stage of postconviction proceedings.

¶ 2  On January 6, 2009, defendant, John Casey Barnes, was convicted by a jury on five counts of criminal sexual assault (720 ILCS 5/12-13(a)(3) (West 2004)). Defendant filed a direct appeal, where the Second District affirmed his convictions and sentence. *People v. Barnes*, No. 2-09-0366 (Feb. 18, 2011) (unpublished order under Illinois Supreme Court Rule 23); *People v. Barnes*, 2013 IL App (2d) 120244-U, ¶ 2.

¶ 3  In July 2011, defendant filed a *pro se* postconviction petition. In August 2015, postconviction counsel filed an amended postconviction petition and, in December 2017, an addendum. The State moved to dismiss defendant's amended petition, which the trial court granted. On appeal, defendant argues (1) the court erred when dismissing his postconviction

petition and (2) postconviction counsel provided unreasonable assistance warranting a remand for further proceedings under the Post-Conviction Hearing Act (Act). 725 ILCS 5/122-1 *et seq.* (West 2022). We affirm.

¶ 4                                    I. BACKGROUND

¶ 5         In September 2008, defendant was charged with five counts of criminal sexual assault for sexually assaulting N.B. over a four-year period when N.B. was between the ages of 13 and 17 and lived with defendant. The matter proceeded to a jury trial in January 2009. We limit our factual recitation to that which is relevant to defendant's claims on appeal.

¶ 6                                    A. Jury Trial

¶ 7         At trial, the State, during its opening statement, conveyed the following:

> "[W]hen [N.B.] was ten years old his mother dumped him. She dumped him on a virtual stranger, a wolf in sheep's clothing, this defendant, not a family member, a neighbor, a man that she barely knew, not any sort of relative but somebody who happened to live near the house where she and her three sons and her mother were living at that time; a neighbor that had no children of his own, yet had a trampoline in his backyard, a trampoline that lured young ten-year-old [N.B.] and his older brothers to this defendant."

¶ 8                                    1. *State's Case-In-Chief*

¶ 9         Police officer Rosanne Baker testified she arrived at defendant's residence on October 28, 2005, after defendant called the police regarding a domestic dispute. Baker was greeted by defendant, who directed her to the backyard. There, Baker met N.B., who she described as distraught and crying. N.B. told Baker defendant was his guardian and had been "using him for sex and that he couldn't take it anymore and he wasn't gay." Baker asked N.B.

for any evidence to support his allegation. N.B. provided Baker with anal beads stored in a nightstand in the home.

¶ 10 Catherine McDermott, a licensed independent social worker, testified about Child Sexual Abuse Accommodation Syndrome (CSAAS). McDermott explained CSAAS is a collection of five characteristics exhibited by children who have been sexually abused: (1) secrecy, (2) helplessness, (3) entrapment/accommodation, (4) delayed or conflicted disclosure, and (5) recantation. The "secrecy" characteristic encompasses the ideas that (1) the abuse occurs in secrecy and the abused child is aware that revealing the secret would change everything in their life, (2) the offender has threatened them to keep the abuse secret, or (3) the offender has told them no one would believe them if they revealed the secret. McDermott explained that "helplessness" meant the child would not reveal the abuse immediately because the adult offender had more power. "Entrapment" meant the abused child feared not being believed if they revealed the abuse or that they felt trapped when the abuse occurred over a long period. McDermott explained children tended to make adjustments to survive the abuse by going into a denial stage or exhibiting certain numbing behaviors such as drinking, aggression, or running away. Furthermore, a child may have continued to love the abuser, a feeling which allowed the child to feel more in control.

¶ 11 According to McDermott, "delayed or conflicted disclosure" occurred because a child feared losing security, a home, or a parent/caretaker. The child knew things would change if they revealed the abuse. They feared being blamed or looked at differently. "Recantation" referred to the child sometimes recanting the allegations when he feels he was not believed or was chastised for revealing the abuse. McDermott stated CSAAS is not used to determine if sexual abuse occurred.

¶ 12          McDermott further explained male victims of abuse typically report the abuse less often when the perpetrator is of the same sex. She explained boys are often concerned about being perceived as homosexual, that they are weak, or that something is wrong with them. On cross-examination, she stated CSAAS had not been addressed at any of the 70 conferences she had attended over the past 12 years. She admitted CSAAS is not recognized by the Diagnostic and Statistical Manual of Mental Disorders-IV (DSM-IV).

¶ 13          N.B. testified he met defendant when he was 10 years old. Defendant and his boyfriend, Chris Reider, had moved into the house behind N.B.'s grandparents' home. Defendant had a trampoline in his yard. N.B. and his brothers would frequently jump on the trampoline or "hang out" with defendant. Defendant would take them to movies and dinner. N.B. said defendant became a father figure to him and he enjoyed spending time with defendant. In October 1998, when N.B. was 10 years old, he moved in with defendant. N.B.'s mother agreed to allow defendant to become N.B.'s legal guardian. N.B. changed his last name to defendant's and thereafter, referred to defendant as "dad."

¶ 14          N.B. testified defendant's first sexual act against him occurred when they lived in Roscoe, Illinois, when N.B. was 13 years old. At the time, Reider still lived with defendant, but they had broken up and were sleeping in separate bedrooms. Defendant touched N.B.'s penis over his clothing for a "couple seconds." N.B. described defendant's affection as a "little bit too much sometimes." He said he was scared after defendant touched his genitals, as he believed it was intentional. Defendant purchased a car for N.B. when he turned 16 years old.

¶ 15          N.B. also testified defendant occasionally showed him pornographic movies, which depicted homosexual acts, while telling N.B. it was okay. N.B. stated defendant performed oral sex on him over 100 times when he was between the ages of 13 and 17. N.B.

- 4 -

described feeling awkward, as he did not know what to do about defendant's sexual conduct. He was scared. N.B. described a sexual incident where his mother and brother, B.N., were in defendant's home downstairs while he and defendant were upstairs. Defendant "shoved his penis in my butt and I screamed and my mom—when we came out my mom said she thought we were just having wild sex." However, N.B. stated his mother never inquired further about the incident. N.B. never told her what happened because he did not trust her or believe she would help him. N.B. said he did not think there was anyone who could help him.

¶ 16      N.B. stated defendant would kiss him on the lips and force him to "make out" with him. This began occurring after Reider moved out. Defendant would also kiss N.B. on the neck and chest. N.B. described defendant's conduct of performing oral sex on him as spontaneous and sporadic. N.B. tried to fight off defendant at times, but defendant would hold him down. When N.B. screamed, defendant would place a pillow over his head. N.B. described almost suffocating on one occasion.

¶ 17      N.B. testified that, in 2004, his mother and brothers moved in with defendant. Defendant's sexual abuse continued, but no one inquired about defendant's conduct. N.B said defendant forced him to perform oral sex, which made him feel "gross." Defendant would also put his finger in N.B.'s anus when he performed oral sex on him. N.B. also stated defendant put his penis in N.B.'s anus 10 to 15 times, including an incident on October 10, 2005, while they were both in a hot tub. Defendant also put anal beads in N.B.'s anus once or twice.

¶ 18      N.B. stated he did not consider himself to be homosexual and defendant's conduct confused him. N.B. said he had girlfriends.

¶ 19      During a trip with defendant to Georgia in September or October 2005, defendant sexually abused N.B. N.B. recounted a conversation with his brother, D.N.:

"Q. Was it during that trip that you talked to your brother about what was going on?

A. Yes.

Q. What did you tell [D.N.]?

A. I was in the bathroom brushing my teeth and [D.N.] came in and asked me if something was going on, and I said no. Then I started crying. And I went out to the living room and just sat in the chair watching TV, and then [D.N.] came to me and told me that it was happening to both of us.

Q. Did you then tell [D.N.] what was going on?

A. Not at that moment, no."

¶ 20    N.B. explained how defendant would discuss his future with N.B. in terms of getting married. He said defendant bought rings "to symbolize [their] promise to each other." Defendant gave N.B. several cards expressing his love. These cards were admitted into evidence. One card read as follows:

> "You are in my thoughts. You are in my dreams. You are in my heart. You are in my fantasies. You are in my soul. You are in every waking moment. You really get around. Thanks for choosing me. I love you more than my life. Love, [defendant]."

Another read:

> "[N.B.], from the time I wake up to the time I go to sleep you are always in my thoughts. I said a long time ago I would always take care of you and be there. You and I made a promise and sealed it with a ring. That made it forever and I will

always hold true to my commitment. I love you and hope this ring brings a smile and warm feeling to your day. Love you always, [defendant]."

¶ 21        N.B. recalled having a gut feeling that it was safe to tell Officer Baker about defendant's abuse. N.B. was taken to the hospital for evaluation and testing—testing which included a rape kit.

¶ 22        Dr. Raymond Davis Jr., a pediatrician, testified to examining N.B. on November 30, 2005. During the exam, Davis observed a healed and scarred tear of the middle upper frenulum tissue in N.B.'s mouth. The doctor could not date when the tear occurred. He stated the cause could have been from forced oral sex or from a fall or impact to the lips or gums. He noted N.B. had not reported any injuries to his mouth. Dr. Davis also noted two anal fissures, but he was again unable to date when they occurred. However, in his opinion, they were at least two weeks old. Dr. Davis stated the fissures were caused by trauma or over-stretching, which could have been from constipation or anal sex. N.B. had not reported any history of constipation but did report he had experienced anal bleeding. Dr. Davis said anal bleeding could be from diarrhea or tears in the tissue from forced penile penetration. In the doctor's opinion, his exam was consistent with N.B. being subjected to oral sex and anal penetration. He considered N.B.'s exam to be abnormal due to his findings of trauma.

¶ 23                            2. *Defendant's Case-In-Chief*

¶ 24        B.N., N.B.'s older brother, testified he had previously lived with defendant. B.N. did not have sex with defendant and never observed defendant have sex with his brothers, N.B. or D.N. In August 2006, B.N. recalled N.B. telling him that if he "went down and told on him that he was lying, that he would kill [B.N.]" B.N. said, "I told [N.B.] I was going to and that I didn't care."

¶ 25        On cross-examination, B.N. denied telling detectives (1) defendant began kissing him on the mouth and fondling his penis and testicles and (2) defendant had told him he and N.B. were using anal beads together and defendant had put the beads in N.B.'s anus. B.N. also denied defendant told him he and N.B. had sex in a hot tub.

¶ 26        N.B.'s mother testified she still saw defendant, as he was helping her remodel her house. She stated defendant never told her that he and N.B. were sexually active, not even as a joke. She denied telling Officer Baker defendant told her that they were sexually active. However, on November 8, 2005, she told detectives defendant would tell jokes by coming into a room and announcing he had the best sex with N.B. She denied believing defendant when he announced such a thing.

¶ 27        Defendant testified he never had sexual contact with N.B. and stated he was unaware where he kept the anal beads. He admitted writing the cards to N.B. but denied jokingly saying he and N.B. had sex in a hot tub or that he and N.B. had been sexually active.

¶ 28                        3. *State's Rebuttal Evidence*

¶ 29        Detective Paul Swanberg testified he interviewed B.N. on November 8, 2005. Initially, B.N. denied having sexual encounters with defendant. According to Swanberg, B.N. stated defendant joked about having sex with N.B. Later in the interview, B.N. stated when he was 18 years old, defendant began kissing him on the mouth and fondling his penis and testicles. He stated defendant told him he and N.B. had sex in a hot tub, but B.N. thought defendant was joking. B.N. also said defendant told him he placed anal beads in N.B.'s anus.

¶ 30        Officer Baker testified that N.B.'s mother told her defendant had said he and N.B. were sexually active. N.B.'s mother thought defendant was joking.

¶ 31                        4. *Close of Evidence*

¶ 32      During closing arguments, the State argued "[N.B.] was scooped up by this wolf in sheep's clothing. He looked good from the outside; good job, nice house, lots of money. He was a wolf inside."

¶ 33      The jury found defendant guilty on all charges.

¶ 34      Defendant moved for a judgment notwithstanding the verdict or a new trial, which the trial court denied. Defendant was sentenced to 7 years' imprisonment on four counts to run consecutively and 10 years' imprisonment for count III (involving the use of anal beads) to be served consecutively. Defendant appealed.

¶ 35                                    B. Direct Appeal

¶ 36      On direct appeal, defendant argued (1) the trial court erred by admitting expert testimony concerning CSAAS, (2) the evidence was insufficient to support his guilt beyond a reasonable doubt, and (3) the court erred when imposing a harsher sentence on one of his convictions. *Barnes*, No. 2-09-0366 (unpublished order under Illinois Supreme Court Rule 23). The appellate court found the trial court did not err when admitting expert testimony concerning CSAAS and the evidence was sufficient to sustain defendant's five convictions for criminal sexual assault. *Id.* However, the appellate court found through a plain-error analysis the court had erred during sentencing. The case was remanded for resentencing on count III. *Id.*

¶ 37      Following remand, the trial court conducted a new sentencing hearing and again sentenced defendant to 10 years' imprisonment on count III. Defendant appealed, and the appellate court affirmed. *Barnes*, 2013 IL App (2d) 120244-U, ¶ 1.

¶ 38                              C. Postconviction Proceedings

¶ 39      In July 2011, defendant filed a *pro se* postconviction petition. In the petition, defendant made three claims for ineffective assistance of appellate counsel for failing to raise

ineffective assistance of trial counsel due to trial counsel's failure to (1) object to hearsay by N.B. about D.N.'s statement he had also been abused, (2) object to testimony by McDermott because she was not accepted as an expert, and (3) object to testimony by Dr. Davis on the same grounds. The trial court moved defendant's petition to the second stage of postconviction proceedings and appointed counsel.

¶ 40 In August 2015, postconviction counsel filed an amended petition and a certificate of compliance in accordance with Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013). The amended petition included defendant's claims as alleged in the *pro se* petition and added 19 other claims. Counsel attached exhibits including (1) a report of an examination by Dr. Michael Polka from October 29, 2005, finding N.B.'s genitals and anus were normal with no obvious trauma, (2) an affidavit from Dr. Terrance Lichtenwald, a clinical psychologist, stating CSAAS was not supported by scientific data and citing an article written in 2005, and (3) a supplemental police report where N.B.'s brother D.N. had recanted his earlier assertion of abuse at the hands of defendant. In October 2017, postconviction counsel filed an addendum to the amended petition raising another claim of ineffective assistance of trial and appellate counsel for not challenging the State's argument referring to defendant as "a wolf in sheep's clothing."

¶ 41 In October 2018, the State moved to dismiss the amended petition. After various responses by each party, in March 2022, the trial court entered a written order dismissing defendant's postconviction petition. The court found all defendant's claims regarding ineffective assistance of trial counsel were forfeited, as they could have been raised on direct appeal but were not. The court proceeded to address the merits of the issues related to ineffective assistance of appellate counsel.

¶ 42　　　　　　Regarding hearsay testimony by N.B. about D.N.'s statement, the trial court found defendant had failed to show prejudice. The court found defendant's claims regarding an expert to contradict McDermott neither demonstrated appellate counsel's unreasonableness nor that defendant was prejudiced. The court noted that trial counsel did cross-examine McDermott on various deficiencies of CSAAS as evidence and later argued it was not relevant to the case. The court also noted Dr. Lichtenwald's affidavit represented his opinions on June 11, 2015, but did not assert he held those opinions in 2009 at the time of the trial.

¶ 43　　　　　　Regarding the failure to present medical evidence to contradict Dr. Davis, the trial court noted Dr. Polka's examination "contained many other entries that would potentially have been harmful to defendant." The court concluded trial counsel's defense strategy was to question Dr. Davis on cross-examination with the goal of establishing other potential causes of the anal fissures he had observed.

¶ 44　　　　　　The trial court agreed the State's repeated comment that defendant was "a wolf in sheep's clothing" was improper. However, the court found the comments were made to assist the jury to understand the evidence from N.B.'s perspective and, under the circumstances, were reasonable. The court found defendant had failed to show appellate counsel was unreasonable or that he had been prejudiced.

¶ 45　　　　　　This appeal followed.

¶ 46　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 47　　　　　　On appeal, defendant argues (1) the trial court erred by dismissing his postconviction petition when he made a substantial showing of a constitutional violation on multiple claims of ineffective assistance of both trial and appellate counsel, or, in the alternative (2) his petition should be remanded for further proceedings under the Act because postconviction

counsel provided unreasonable assistance by failing to properly amend the petition in compliance with Rule 651(c).

¶ 48 "The [Act] provides a procedural mechanism through which criminal defendants can assert that their federal or state constitutional rights were substantially violated in their original trials or sentencing hearings." *People v. Buffer*, 2019 IL 122327, ¶ 12. A postconviction petition must clearly set forth the ways in which a defendant claims his constitutional rights were violated. 725 ILCS 5/122-2 (West 2016). "The petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." *Id.*

¶ 49 "The Act provides a three-stage process for the adjudication of postconviction petitions." *Buffer*, 2019 IL 122327, ¶ 45. Once a postconviction petition moves from the first to the second stage, the trial court may appoint counsel to represent the defendant and the State may file responsive pleadings. *People v. House*, 2021 IL 125124, ¶ 17. During the second stage, the court determines "whether the postconviction petition and any accompanying documentation make a substantial showing of a constitutional violation." *Id.* If a defendant fails to make a substantial showing of a constitutional violation, his postconviction claims are subject to dismissal. *Id.*

¶ 50 At the second stage, "[t]he inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the [trial] court to engage in any fact-finding or credibility determinations." *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). Instead, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). A substantial showing of a constitutional violation measures "the legal sufficiency of the petition's well-pled allegations of a

constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." (Emphasis omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 35. "Nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act." *Coleman*, 183 Ill. 2d at 381; see *Pickel v. Springfield Stallions, Inc.*, 398 Ill. App. 3d 1063, 1066 (2010) (" 'Well-pleaded facts' is a term that stands in contrast to 'conclusions.' "). The defendant bears the burden of making a substantial showing of a constitutional violation. *Domagala*, 2013 IL 113688, ¶ 35. The court's dismissal of a defendant's claims at the second stage of proceedings is subject to *de novo* review. *People v. Johnson*, 2017 IL 120310, ¶ 14.

¶ 51            A. Claims of Ineffective Assistance of Trial and Appellate Counsel

¶ 52            Defendant contends he made a substantial showing of ineffective assistance by his trial and appellate counsel on five claims raised in his petition. Specifically, he claims (1) the failure to object to hearsay testimony by N.B., (2) the failure to introduce medical evidence that contradicted the State's medical evidence, (3) the failure to call an expert witness to undermine the value of CSAAS, (4) the failure to object to improper closing argument by the State, and (5) the cumulative effect of counsel's errors demonstrate trial counsel's ineffectiveness and appellate counsel's ineffectiveness for not raising these issues on direct appeal.

¶ 53            Claims of ineffective assistance of trial counsel are governed by the two-pronged test from *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To succeed on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687. To satisfy the deficiency prong of the *Strickland* test, a defendant must show his counsel's performance was "so inadequate 'that counsel was not functioning as the "counsel" guaranteed by the sixth

amendment.' " *People v. Dupree*, 2018 IL 122307, ¶ 44 (quoting *People v. Evans*, 186 Ill. 2d 83, 93 (1999)). To satisfy the prejudice prong of the *Strickland* test, a defendant must show "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694).

¶ 54　　　　　Claims of ineffective assistance of appellate counsel are also governed by the two-pronged test from *Strickland*. *People v. Johnson*, 206 Ill. 2d 348, 377-78 (2002). In order to succeed on an ineffective-assistance-of-appellate-counsel claim, a defendant must show it is arguable (1) his appellate counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability, but for appellate counsel's errors, the appeal would have been successful. *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). Appellate counsel's decision regarding which issues to pursue is generally entitled to substantial deference. *People v. Johnson*, 205 Ill. 2d 381, 406 (2002). Appellate counsel is not required to " 'brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit.' " *Johnson*, 206 Ill. 2d at 378 (quoting *People v. Easley*, 192 Ill. 2d 307, 329 (2000)). Where the underlying issue is nonmeritorious, a defendant suffers no prejudice; therefore, the reviewing court is required to examine the merits of the claims not raised by appellate counsel. *People v. Simms*, 192 Ill. 2d 348, 362 (2000).

¶ 55　　　　　　　　　　1. *Failure to Object to Hearsay Claim*

¶ 56　　　　　Defendant claims N.B.'s statement "it was happening to both of us" was hearsay and that his trial counsel's failure to object to the statement as hearsay amounted to deficient performance. He also claims he was prejudiced by this testimony. The State contends N.B.'s statement was vague and not hearsay.

¶ 57     Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). Defendant contends when N.B. said "it was happening to both of us," the "it" referenced defendant's sexual abuse, thereby conveying to the jury that D.N., his brother, had also been sexually abused. However, it is not clear from N.B.'s testimony that defendant's interpretation is correct. Just prior to the statement at issue, N.B. testified D.N. had asked him if something was going on, to which N.B. said, "[N]o." After N.B. started crying and went to the living room, N.B. said D.N. came to him and said, "[I]t was happening to both of us." But, when the State asked a follow-up question—if N.B. told D.N. what was going on—N.B. responded, "Not at that moment, no." Defendant concedes N.B. never actually testified about what he told D.N. regarding defendant's abuse. Although we are cognizant of the implication of N.B.'s statement within the context of how it occurred, we cannot ignore N.B.'s actual testimony. Further, we need not determine whether it was truly hearsay.

¶ 58     The State alternatively argues trial counsel's decision to not object was a matter of trial strategy because objecting could have drawn further attention to N.B.'s statement. While the trial court concluded the statement was hearsay, it also noted the statement was neither emphasized nor mentioned again. Counsel's decision to not draw attention to N.B.'s lone statement supports a finding that trial counsel's performance was not objectively unreasonable. Because it was not clear from N.B.'s testimony that D.N. was referring to his own sexual abuse, we cannot find fault with trial counsel's decision to not object, hoping to minimize the statement by not calling further attention to it. Indeed, the *Strickland* Court, on which our standard for ineffective assistance relies, was clear that "[j]udicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be

made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 669. Therefore, we find trial counsel did not render deficient performance by failing to object to N.B.'s statement as hearsay. Because defendant must satisfy both prongs under the *Strickland* test, we find trial counsel did not render ineffective assistance. See *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 57 ("The failure to satisfy either the deficiency prong or the prejudice prong precludes a finding of ineffective assistance of counsel."). Likewise, defendant's failure to show trial counsel rendered ineffective assistance precludes a finding that appellate counsel was ineffective for the same reasons. "Where the underlying claim of ineffective assistance by trial counsel would not have succeeded, there is no arguable basis for a claim that appellate counsel was ineffective." *People v. McDonald*, 2021 IL App (1st) 190687, ¶ 41.

¶ 59                    2. *Failure to Introduce Medical Evidence Claim*

¶ 60            Defendant next argues trial counsel's failure to present evidence of Dr. Polka's examination of N.B., wherein no signs of anal trauma were found, amounted to ineffective assistance. The State contends counsel's failure to have Dr. Polka testify was also a matter of sound trial strategy because Dr. Polka's report contained considerable amounts of prejudicial information about defendant. The report indicated that (1) N.B. disclosed defendant had been abusing him since age 10, (2) defendant forced N.B. to give and receive both oral and anal sex, and (3) defendant had penetrated N.B.'s anus with his penis, finger, and anal beads. We agree with the State.

¶ 61            Our supreme court has explained trial counsel's "decisions concerning whether to call certain witnesses on a defendant's behalf are matters of trial strategy, reserved to the discretion of trial counsel." *People v. Enis*, 194 Ill. 2d 361, 378 (2000). A trial counsel's decision whether to call a witness is strongly presumed to be sound trial strategy that is "generally

immune from claims of ineffective assistance of counsel." *Id.* A failure to a call a witness amounts to ineffective assistance where it is "so unsound that no meaningful adversarial testing was conducted." *Id.*

¶ 62 Here, trial counsel's strategy was sound. Calling Dr. Polka as a witness would have unearthed significantly more damaging testimony in an effort to contradict Dr. Davis's single finding of anal fissures. Furthermore, trial counsel sought meaningful adversarial testing of Dr. Davis by having him concede to other potential causes of the anal fissures during cross-examination. Therefore, we find defendant has failed to show counsel's performance was deficient and, thus, cannot show counsel rendered ineffective assistance. *Phillips*, 2017 IL App (4th) 160557, ¶ 57. For the same reasons, defendant has failed to show appellate counsel rendered ineffective assistance. *McDonald*, 2021 IL App (1st) 190687, ¶ 41.

¶ 63                      3. *Failure to Call Expert Witness Claim*

¶ 64 Defendant next argues trial counsel was ineffective for failing to call Dr. Lichtenwald as a witness to counter McDermott's testimony regarding CSAAS. The State contends Dr. Lichtenwald's proposed testimony would not have been admissible, nor was trial counsel's performance deficient for failing to have Dr. Lichtenwald testify.

¶ 65 As we noted above, trial counsel's decision whether to call a witness is generally immune from ineffective-assistance claims. *Enis*, 194 Ill. 2d at 378. Dr. Lichtenwald's affidavit shows he was tasked with offering an "expert opinion as to the validity and reliability of what is commonly referred to as [CSAAS]." Dr. Lichtenwald asserted "[CSAAS] is an opinion not developed based on scientific research, validity studies, or reliability studies." On direct appeal, the appellate court found defendant had forfeited his claim challenging McDermott's testimony. When deciding whether to apply plain error, the Second District found no error in the trial

court's decision to allow the testimony. *Barnes*, No. 2-09-0366 (Feb. 18, 2011) (unpublished order under Illinois Supreme Court Rule 23).

¶ 66       Defendant claims his trial counsel should have challenged McDermott's testimony by objecting and calling Dr. Lichtenwald as a witness to counter the proposed reliability of CSAAS. However, we find trial counsel's performance was not deficient for failing to call Dr. Lichtenwald as an expert witness. McDermott testified CSAAS was not used to diagnose sexual abuse. On cross-examination by trial counsel, McDermott admitted CSAAS had not been addressed at any conference she attended over the past 12 years and was not recognized by the DSM-IV. Counsel's cross-examination constituted meaningful adversarial testing. Additionally, Dr. Lichtenwald's affidavit supports McDermott's testimony, where he states, "Professionals who deal with issues of child sexual abuse may accept the assertions promulgated by the CSAAS model as generally accepted within their community" before criticizing CSAAS for lacking independent verification. Thus, the admissible portion of Dr. Lichtenwald's testimony would have only corroborated McDermott rather than contradicted her testimony. Therefore, we find defendant has failed to show trial counsel's performance was deficient and, thus, cannot show counsel rendered ineffective assistance. *Phillips*, 2017 IL App (4th) 160557, ¶ 57. For the same reasons, defendant has failed to show appellate counsel rendered ineffective assistance. *McDonald*, 2021 IL App (1st) 190687, ¶ 41.

¶ 67              4. *Failure to Object to Improper Argument Claim*

¶ 68       Defendant argues trial counsel's failure to object to the State's closing argument referring to him as a "wolf" amounted to ineffective assistance and cites *People v. Ivory*, 333 Ill. App. 3d 505 (2002), in support. The State contends counsel's performance was not deficient for

failing to object and defendant was not prejudiced by the State's comment during closing argument.

¶ 69    In *Ivory*, the State, during closing argument, made a nearly identical argument as the State did in the instant case by claiming the defendant was " 'just a wolf in sheep's clothing.' " *Id.* at 516. In *Ivory*, trial counsel for the defendant objected, which was overruled by the trial court. *Id.* at 516-17. The *Ivory* court found the trial court had erred and the State's argument referring to the defendant as an animal was improper. *Id.* (citing *People v. Johnson*, 119 Ill. 2d 119, 139 (1987)).

¶ 70    We find the State's comments referring to defendant as an animal were improper. Therefore, we find trial counsel's failure to object to these comments was objectively unreasonable. In *Ivory*, the court found the State's improper remarks did not amount to reversible error because the defendant had failed to show prejudice where the evidence of his guilt was overwhelming. *Id.* at 517. Again, to satisfy his burden under *Strickland*, defendant must show both counsel's deficient performance and prejudice. The prejudice prong requires defendant show a reasonable probability the jury would have reached a different outcome. *Strickland*, 466 U.S. at 694. Here, like *Ivory*, the evidence of defendant's guilt was overwhelming.

¶ 71    On appeal, defendant largely characterizes the evidence as dependent on N.B.'s testimony alone. However, N.B.'s testimony that defendant had sexually abused him for years was corroborated by many other witnesses and defendant's own conduct. McDermott's testimony helped the jury understand N.B.'s behavior. Dr. Davis found anal fissures and opined they were caused by trauma from either anal sex or constipation, though N.B. reported no history of constipation. Officer Baxter recovered anal beads from defendant's home, which also supported N.B.'s testimony. Similarly, N.B.'s mother admitted defendant had declared he had

sex with N.B. The fact that his mother viewed the comment as a joke did not make the statement any less true for the jury. Furthermore, defendant's cards written to N.B. showed defendant fantasized about N.B. and supported N.B.'s testimony defendant had sought to marry him.

¶ 72    We find defendant has failed to show prejudice from the State's improper comments. Because defendant has failed to show prejudice, he cannot show trial counsel rendered ineffective assistance. *Phillips*, 2017 IL App (4th) 160557, ¶ 57. Thus, for the same reasons, defendant cannot show appellate counsel rendered ineffective assistance. *McDonald*, 2021 IL App (1st) 190687, ¶ 41.

¶ 73                    5. *Cumulative Error Claim*

¶ 74    Defendant argues that the cumulative effect of trial counsel's deficiencies denied him a fair trial. The State argues defendant has not established any deficiencies, let alone prejudice from cumulative error. We agree with the State.

¶ 75    Only one of defendant's claims showed any deficiency in trial counsel's performance. Defendant was able to show counsel's failure to object to the State's characterization of him as an animal was deficient, but he did not sufficiently show how he was prejudiced from the error. Because defendant has not shown multiple errors of trial counsel, he cannot show that multiple errors cumulatively caused prejudice. Ultimately, defendant has failed to make a substantial showing of ineffective assistance of trial and appellate counsel.

¶ 76    B. Claims of Unreasonable Assistance of Postconviction Counsel

¶ 77    Defendant next argues his postconviction counsel rendered unreasonable assistance by failing to (1) adequately address the procedural bar of *res judicata* and (2) shape defendant's ineffective assistance claims into proper legal form to satisfy the basic elements of deficient performance and prejudice.

¶ 78　　　　In postconviction proceedings, there is no constitutional right to counsel; rather, the right is supplied by statute. *People v. Addison*, 2023 IL 127119, ¶ 19. A defendant is entitled to a "reasonable level of assistance," which is less than what is afforded by the federal and state constitutions. (Internal quotation marks omitted.) *Id.* The distinction comes from the fact that postconviction counsel is appointed to shape a defendant's complaints into proper legal form and present them, not to protect a defendant "from the prosecutorial forces of the State." *Id.*

¶ 79　　　　At a minimum, Rule 651(c) requires postconviction counsel to (1) consult with defendant to ascertain his contentions, (2) examine the record of the trial proceedings, and (3) make "any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of [defendant's] contentions." Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013).

¶ 80　　　　Rule 651(c) ensures defendants receive reasonable assistance from postconviction counsel. *Addison*, 2023 IL 127119, ¶ 20. Compliance with Rule 651(c) is mandatory. *Id.* ¶ 21. Postconviction counsel creates a rebuttal presumption of reasonable assistance when filing a Rule 651(c) certificate. *Id.* A defendant can show failure to comply with Rule 651(c) by demonstrating postconviction counsel did not make all the necessary amendments to the *pro se* petition. *Id.*

¶ 81　　　　　　　　1. *Failure to Adequately Address Res Judicata Claim*

¶ 82　　　　Defendant also argues postconviction counsel failed to shape his claims into viable constitutional issues. He claims sound legal arguments could have been made to address the alleged procedural bar of *res judicata* as it related to his allegations of ineffective assistance. Defendant argues postconviction counsel should have presented the difference between the claims decided on direct appeal and the claims in the petition and explained how the merits of the postconviction claims were not dependent on the claims decided on direct appeal.

¶ 83 We begin by noting postconviction counsel filed a Rule 651(c) certificate, creating a rebuttal presumption he adequately investigated, amended, and presented defendant's claims. "Postconviction attorneys have a duty to attempt to overcome procedural bars, such as forfeiture, *res judicata*, and untimeliness." *People v. Anguiano*, 2013 IL App (1st) 113458, ¶ 44. Here, postconviction counsel amended defendant's *pro se* petition to add 19 additional claims, and later, in an addendum, added another claim regarding the State's improper remarks during closing argument. Of all the claims presented in this appeal, postconviction counsel's addendum claim has been the only claim with any modicum of success.

¶ 84 When confronted with *res judicata* by the trial court, postconviction counsel framed the issues distinctly, without running afoul of any of his ethical obligations to the court. The fact that "appellate counsel, with the benefit of hindsight, would have presented defendant's claims differently or added additional claims does not establish that postconviction counsel provided unreasonable assistance" *People v. Conway*, 2023 IL App (3d) 210334-U, ¶ 19. We find defendant has failed to rebut our existing presumption postconviction counsel provided reasonable assistance.

¶ 85 2. *Failure to Shape Arguments Into Proper Legal Form Claim*

¶ 86 Defendant argues postconviction counsel properly alleged the essential elements of ineffective assistance of trial and appellate counsel but failed to provide sufficient argument or analysis to show prejudice. Defendant cites *People v. Dixon*, 2018 IL App (3d) 150630, in support.

¶ 87 In *Dixon*, the appellate court found postconviction counsel's amended petition was not in proper legal form. *Id.* ¶¶ 20-21. The *Dixon* court found the record rebutted postconviction counsel's Rule 651(c) certificate where the "amended petition alleged several

claims of ineffective assistance of counsel but failed to allege that the defendant was prejudiced by trial counsel's deficiencies." *Id.* ¶ 16. Additionally, counsel had "failed to allege *any* specific facts in support of the general claims raised in the petition." (Emphasis in original.) *Id.* ¶ 21.

¶ 88    We find *Dixon* distinguishable from the present case. First, unlike *Dixon*, postconviction counsel did allege the basic elements of defendant's ineffective assistance claims, which defendant concedes. Second, the record belies defendant's argument that postconviction counsel merely made conclusory allegations of prejudice. Counsel cited case law and provided an analysis to support his arguments. For example, with regard to the first claim regarding N.B.'s alleged hearsay testimony, counsel argued the admitted testimony rendered the trial unreliable and fundamentally unfair. Counsel argued the standard from *United States v. Cronic*, 466 U.S. 648 (1984), applied because trial counsel's failure to object to the claimed hearsay amounted to a failure to provide meaningful adversarial testing. We find postconviction counsel's representation amounted to more than merely stating a conclusion.

¶ 89    In the next claim, postconviction counsel argued trial counsel's failure to object to McDermott's testimony as not having been formally accepted as an expert amounted to ineffective assistance. Counsel explained the law regarding expert witnesses and identified the importance of McDermott's testimony to the State's case. However, counsel explained it was prejudicial to permit McDermott to testify to the underlying theory of CSAAS when she was never tendered or accepted as an expert witness. Again, we conclude, contrary to defendant's claim, the arguments in the amended petition were not merely conclusory.

¶ 90    In one instance, defendant contends, postconviction counsel had argued trial counsel should have moved for a mistrial, yet he did not even allege prejudice. However, the claim defendant cites specifically states, "[h]ad effective counsel objected to the prejudicial

evidence as outline[d] in the above paragraphs, trial counsel should have motioned the court to grant a mistrial." Postconviction counsel's argument here was referencing a myriad of previously alleged errors by trial and appellate counsel, which was akin to a cumulative-error argument, of which all alleged prejudice.

¶ 91 We refer back to the court in *Dixon*, where it explained:

"[W]e acknowledge that our supreme court has held that, in the absence of a showing that sufficient facts or evidence exists, postconviction counsel does not provide unreasonable assistance in "failing to make the [amended] petition's allegations factually sufficient to require the grant of relief." [Citation.] Here, it was not postconviction counsel's failure to plead *sufficient* facts to ultimately require the granting of relief that rendered counsel's assistance unreasonable. Rather, counsel provided an unreasonable level of assistance because he failed to allege *any* specific facts in support of the general claims raised in the petition." (Emphases in original and internal quotation marks omitted.) *Dixon*, 2018 IL App (3d) 150630, ¶ 21.

¶ 92 As we noted above, the fact that appellate counsel for defendant would have argued the petition differently is not enough to establish unreasonable assistance. *Conway*, 2023 IL App (3d) 210334-U, ¶ 19. In *Dixon*, postconviction counsel failed to allege *any* specific facts, but that is not the case here. Defendant's argument that postconviction counsel's facts are insufficient does not amount to an unreasonable assistance finding. *People v. Spreitzer*, 143 Ill. 2d 210, 221 (1991). Therefore, we find postconviction counsel did not render unreasonable assistance.

¶ 93 III. CONCLUSION

- 24 -

¶ 94        For the reasons stated, we affirm the trial court's judgment.

¶ 95        Affirmed.